2019 IL App (3d) 180190

Opinion filed October 8, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0190 Circuit No. 07-CF-1926 |
| GILBERT KNOWLES, | ) ) ) | Honorable Carmen Julia Goodman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Carter and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1     The defendant, Gilbert Knowles, appeals the second-stage dismissal of his postconviction petition, arguing (1) his petition alleged sufficient facts for his ineffective assistance of counsel claims to advance to the third stage, (2) Judge David Carlson should not have recused himself, and (3) the Will County circuit court used flawed reasoning when dismissing the petition.

¶ 2                                    I. BACKGROUND

¶ 3     In 2010, the defendant was convicted of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)) and sentenced to 52 years' imprisonment. The State's evidence at the bench trial established that Julie Miller, her two-year-old son, Devin, and her two daughters lived with the

defendant in Joliet. The defendant was Julie's boyfriend. On September 17, 2007, the children had been with Devin's father during the day, but had been returned to Julie's care around 8 p.m. She did not notice that Devin had any injuries. She gave the children macaroni and cheese and put them to bed around 9:30 p.m. Shortly thereafter she received a phone call from the defendant. The defendant was with his brother, Steven Gretz, at a bar and asked Julie if she could take Steven to Morris. Julie agreed, the defendant returned home, and then Julie left to pick up Steven. Julie and Steven stayed at the bar for a while, and then Julie drove Steven back to her house to retrieve something from the defendant's car. She briefly went into the house and saw the defendant asleep on the couch. She then took Steven home and stayed at his house for a couple of hours. When she arrived home, she went straight to bed. The next morning, her daughter woke her around 8 a.m. and told her that she could not find Devin. Julie ran into Devin's room and found him wedged between the wall and his bed. She grabbed him and called 911. Devin was pronounced dead at the scene at 9:03 a.m. There were no signs of forced entry into the home.

¶ 4        Detective Linda Odom testified as an expert in the field of criminal investigation, specifically regarding child abuse injuries. She stated that she was a detective with the Joliet Police Department. She interviewed the defendant. He told Odom that he worked at Backyard Pools and had been there on September 17. He had a bad day at work as the truck he usually drove was not working, he had forgotten his lunch, had not slept well, and was recovering from bronchitis. He got off of work at 4 p.m. and went to a bar with Steven. He had approximately seven beers. At first he told Odom "that he was intoxicated to the point of getting sick because he had not had lunch." He later altered the statement and said that he was not intoxicated, but was "merely buzzed." Upon returning home, he went outside to have a beer and smoke. When he

2

came back inside, Devin was crying and had blood on his nose and lip. The defendant cleaned Devin up, comforted him, and then Devin went back to bed. The defendant spoke to Julie on the phone shortly thereafter, but did not tell her about Devin's injury. He then went to sleep on the couch. He awoke, put on the jeans and T-shirt that he had worn the night before, and went to work at 6:30 a.m., but had to come back because he forgot his keys. He was at work when Julie called him about Devin. Later, the defendant admitted that he had also used cocaine that night. The defendant asked Odom

> "if Devin was found on the floor or if he was found lodged by the bed—between the bed and the wall because he had gotten stuck there before and he was afraid that maybe he had gotten his head stuck, his ears under the lip of the bed and that that might have caused his death."

Odom showed the defendant the previous photographs of injuries to Devin, and the defendant said that Devin had fallen down the stairs or out of the crib in each of the photographs. The defendant said that Devin was always getting bruised and injured. He told Odom that he had told Julie "that DCFS [Department of Children and Family Services] was going to investigate her because [Devin] looked like he had been hit with a bat and that she could lose her children." When speaking with Odom, the defendant referred to Devin as "that baby boy or that baby." Odom viewed the photographs of injuries to Devin and stated that the injuries were more suggestive of intentional injuries due to their location. The officers took the jeans and white T-shirt the defendant had been wearing.

¶ 5        Jose Campos testified that he was a police officer for the Wilmington Police Department. On September 18, 2007, he assisted the Joliet Police Department in obtaining information on a person who was employed at Backyard Pools. He entered the wooded area on the side of the

property as directed by Joliet detectives. He was to look "for some possible clothing that was involved in an earlier crime." He found a white T-shirt and a pair of Eddie Bauer jeans "wadded up" in a pile approximately 100 feet into the wooded area. He called the Joliet police and remained at the location until the Joliet police took custody of the clothing.

¶ 6        Three white T-shirts were taken into evidence, one the defendant was wearing when he was taken in for the interview, one discovered in the woods by the defendant's work, and one found in the bottom of the garbage can at Julie's house. The one found in the woods was tested in the crime lab. Kelly Krajnik testified that she is a forensic scientist for the Illinois State Police Joliet Forensic Science Laboratory. She tested stains on a white T-shirt and did not find any blood. However, Lyle Boicken, a forensic scientist for the Illinois State Police crime lab testified as an expert in forensic sciences, specifically biology and DNA. He retested the stains for blood, and the test indicated blood was present. David Turngren testified as an expert in forensic science and DNA. He conducted DNA analysis on the T-shirt and compared it to the DNA profiles from Julie, Devin, and the defendant. The DNA on the T-shirt matched the defendant. Another male DNA profile on the T-shirt was identified and Devin could not be excluded.

¶ 7        Devin's father, Bryan Owens, testified that he was also the defendant's best friend. He testified that Devin was not accident prone. Prior to Devin moving in with Julie and the defendant, Bryan did not notice any injuries on Devin. However, after they moved in, he noticed that Devin had different bruises or injuries about every week. The injuries stopped when the defendant moved out of the house for a couple of weeks, but resumed and became more severe when he moved back in. Bryan took photographs of the injuries, and they were presented in court. When Bryan asked Julie about the injuries, she relayed whatever explanation the defendant had told her. He started taking the photographs because he thought that if Devin was

4

falling often and receiving injuries, Julie and the defendant must not be watching him well. He planned on presenting the photographs during his custody case for the children. After speaking with his divorce lawyer, he decided not to contact DCFS. No injuries occurred while Devin was with Bryan. Bryan always checked Devin for injuries when he was with him, but did not notice any on that day. Mark Owens, Devin's grandfather, had seen him earlier in the day on September 17, 2007, and noted that Devin had no injuries and was playing like normal. Two other witnesses testified that on previous occasions Devin had been left in the defendant's care while they left the house with Julie. On each occasion they arrived back at the house and found that Devin had sustained injuries.

¶ 8       Dr. John Scott Denton testified that he was a forensic pathologist and was qualified as an expert in forensic pathology with a concentration in child injuries. Dr. Bryan Mitchell performed the autopsy. Denton was covering Mitchell's prior cases after Mitchell's death and had reviewed his autopsy report. He stated that Mitchell documented 51 separate and external injuries to Devin, 30 to 35 of the injuries were to Devin's head and face. Mitchell had found that the injuries were caused by multiple instances of blunt force trauma. Denton stated that the injuries were inconsistent with an accidental fall in the bathroom. Denton stated that the injuries were likely fatal in combination, but that the most severe injuries were skull fractures and bruising on his forehead. Had these injuries occurred 12 to 24 hours before Devin's death, they would have been symptomatic. Denton agreed with Mitchell's findings and conclusions and found that Devin "died from cranial cerebral injuries due to blunt trauma to the head." He also stated that Devin likely sustained child abuse prior to this as well based on older injuries. The State showed Denton photographs of Devin's previous injuries that had been deemed accidental falls. Denton stated that he did not believe the injuries were consistent with falling and instead were inflicted

5

injuries. After opening Devin's stomach, Mitchell noted that the pasta that he had eaten was still intact. Because of this, Denton opined that Devin died within a maximum of three hours after he ate the pasta.

¶ 9 Dr. John Plunkett testified for the defense as an expert in forensic pathology and the evaluation of infant injuries. He was a coroner for several Minnesota counties. He reviewed the autopsy report performed by Mitchell and the police report. Plunkett testified that Mitchell could have provided more information by examining all of the bruises on Devin to a higher degree to determine whether some of the injuries were older. Plunkett believed that some of the bruises looked older from the photographs, but could not say without looking at them microscopically. Plunkett stated that he would have done more of a microscopic examination than Mitchell. Mitchell concluded that Devin's "death was the result of cranial cerebral injuries due to multiple blunt force trauma to the head." Plunkett stated that he believed that was "a reasonable conclusion" and "probably" would have been his conclusion as well. However, Plunkett stated that he could not make such a conclusion to be a "reasonable certainty." He stated,

> "If Devin had simply been found dead for example on the floor or on the bed and there was no evidence that he had been moved, then it would have been my conclusion to a reasonable medical certainty that blunt head trauma caused his death.

> However, because of the position his body was found as described in the police investigative reports, wedged upside down between the bed frame and the wall, it's at least possible that Devin, in fact, died as a result of what's called positional *** asphyxia, in other words, being unable to breathe because of the position of his body."

6

Plunkett stated that none of Devin's injuries in and of themselves would have necessarily been fatal. While Plunkett agreed that Devin's injuries were extensive, he also stated that the position in which the body was found also would have made the injuries to his head and neck look worse because of the settling of the blood. Plunkett also stated that if Devin had fallen and hit his head in the bathroom, it could have killed him, though it was unusual for such to occur. Plunkett stated that, if Devin's death was caused by blunt force trauma instead of asphyxiation, the injuries Devin sustained likely happened within 24 to 48 hours of his death, based on the police reports, Plunkett stated he likely sustained the injuries within 12 hours of his death. On cross-examination, Plunkett stated that "[t]o a reasonable medical certainty, Devin's death is a homicide." In his notes, Plunkett had written, "someone beat the shit out of Devin." However, Plunkett stated that, though he thought it was clear that Devin had been beaten, he could not "conclude *** with a reasonable degree of scientific and medical certainty that the beating was the actual cause of death."

¶ 10        Steven testified that the defendant was his half-brother. On the night in question, Julie came to the bar after the defendant went home. They stayed at the bar until around 1 a.m. Before she drove him home to Morris, they stopped at Julie's house to get Steven's marijuana out of the defendant's car. After taking Steven home, Julie stayed for 15 to 20 minutes and then went home. Once Julie returned home, she called Steven, which he thought was unusual because she had never called to tell him she had returned home when she gave him rides on previous occasions.

¶ 11        The defendant testified that he started seeing Julie in 2006 and noticed that Devin had injuries. At that point, the defendant was never alone with Devin and was not living in the house, but Bryan was. The defendant moved in with Julie in December 2006 and Bryan moved out in

7

January 2007. The defendant stated that he and Devin were like father and son. He observed Devin hurt himself approximately three times during the summer of 2007, but the injuries were not severe. The defendant testified that the photographs of the injuries that the State had introduced did not happen in his care. He saw injuries to Devin, but was not present for any of them. The defendant said that Julie would spank and cuss at Devin when disciplining him. He never told the police about Julie disciplining Devin or the injuries Devin had sustained. He told the police that Julie was a great, patient mother and never hit or touched the children. The jeans found by his work were not his because he had never owned a pair of Eddie Bauer jeans.

¶ 12    The court found the defendant guilty. In doing so, the court stated, "The defense believes sufficient evidence exists to suggest an accidental death, specifically a fractured skull from an accidental fall in the bathtub or positional asphyxia when Dev[i]n was accidentally wedged upside down between the wall and his bed or a combination of those events." He was sentenced to 52 years' imprisonment. On appeal, the defendant argued that he was not proven guilty beyond a reasonable doubt, the court abused its discretion in allowing the State to present evidence of prior physical abuse, and the defendant's sentence was excessive. *People v. Knowles*, 2012 IL App (3d) 110015-U. We affirmed. *Id.* ¶ 39.

¶ 13    On January 16, 2013, the defendant filed a *pro se* postconviction petition. The defendant contended that his constitutional rights were violated, stating,

> "Officer Campos testified that after speaking to the Joliet detectives, he was asked to go out to the defendant's workplace, Backyard Pools and look for some clothing possibly used in a crime. And then they gave Officer Campos a description of the clothing—T-shirt and blue jeans. ***

8

Neither the Joliet Police Department Detectives, or the prosecution disclosed who the person was that gave them this description of the clothing and the location where to find them. No person in the police report gave a description of the clothes used in the crime and the location where to find them. Julie Miller and defendant's brother was the last persons to see defendant, neither one of them gave the police a description of the clothes defendant had on that night. And defendant testified the next morning he put back on the same clothes he had on the night that Devin was killed. There's no way the Joliet Police Department Detectives could know the description of the clothes without someone having supplied it—there's also no way they would know the location where to look for the clothes without someone telling them. The information of who told them was withheld from the defense."

The defendant further alleged that appellate counsel had failed to raise this issue. The defendant's petition was not ruled on within 90 days, and the petition was advanced to the second stage.

¶ 14    In its amended postconviction petition, defense counsel contended that trial counsel was ineffective for (1) failing to stipulate to the cause of death, (2) calling an expert, Plunkett, that affirmatively proved the cause of death, (3) failing "to properly investigate the source of a tip leading the police to search the woods behind [the defendant's] place of work that contained incriminating evidence," and (4) failing to "subpoena or utilize the cellular phone records concerning telephone calls on the night of Devin's death between [Julie] and [Steven], which could substantiate [the defendant's] timeline of events thereby undermining her claims of innocence" and "cellular tower records evidencing [Julie's] whereabouts and thereby

9

undermining her claims of innocence." The petition also alleged appellate counsel was ineffective for failing to raise these issues. The State filed a motion to dismiss.

¶ 15　　　　The matter came before Judge David Carlson to hear the State's motion to dismiss on August 24, 2017. Judge Carlson stated,

> "The expert in this case, Doctor Plunkett, I used Doctor Plunkett when I was a defense attorney in a case, *** and I just want to make a record of that as it relates to that.
>
> I don't know if that causes anyone—I can tell you this, there was an issue with the payment of his fees, and Doctor Plunkett complained about me to the ARDC, so I just wanted to make sure that the record is clear on that.
>
> I don't think it has any affect on my ability to rule in this motion, but I did have obviously contact and personal communications with Doctor Plunkett."

The parties then continued arguing the motion. The court asked defense counsel if he had discovery on the petition, and then said,

> "Why don't we do this, why don't we go out a couple of weeks so I can go through all the transcripts. And then if you guys want to supplement anything, if you find a police report or if you—to save you a trip out here, if you talk to [the State], and [State] you can always just give it to me and we will put it on the record and then I can review that as well."

Defense counsel mentioned the cell phone records, and the court then said,

> "If you wanted to supplement the record with something else, I suppose I can do that too. If you're saying the cell phone records are important because there was conflicting statement where she said she was—whatever it may be. If you have a

10

police report to that affect, then perhaps it's not really bootstrapping, I guess it is, that it was ineffective because the trial counsel didn't ask questions on cross examination, I don't know, but I will give you that opportunity if you want to do that."

¶ 16    On November 16, 2017, the parties came back to court, again on the State's motion to dismiss. It does not appear from the record that any of the parties filed any supplementary documents before this time. Judge Carlson stated,

"I raised this issue before. And in reading the transcripts, I'm really on the fence on this. And I'm gonna tell you why ***. Not necessarily on the merits of where we're at, but I want to raise the issue about Dr. Plunkett.

And I need—just to refresh everyone's memory, I—when I was in private practice [I] used the services of Dr. Plunkett. And there are a couple of things in going through the pleadings, as well as the transcripts in this case that you know sometimes we just get a feeling? And as a Judge, the last thing you want is for that feeling to interfere with your ability to make a reasonable and rash decision— irrational decision, not rash.

I guess the easiest thing to do is to just say, you know what, I'm not going to deal with the post-conviction matter, I'm gonna send it—because it deals with Dr. Plunkett and that's one of the major issue, obviously, in your petition. And I would send it over to Judge Goodman. ***

[Defense counsel] under your petition, if I were to grant your request to proceeding to a third stage, doesn't that require me, then, to essentially look at some of the factual issues surrounding Dr. Plunkett's testimony?

11

Trust me, I don't want to do this. I don't want to prolong anything, but I just, I have a feeling about it and I want to just make sure I'm clear before I make my decision as to whether or not to recuse myself on this."

Defense counsel stated, "[I]s it possible that we can go forward to the third stage in all of them except the one that you're thinking about recusing[?]" Judge Carlson stated,

"Dr. Plunkett? Here's the only thing, I don't want to necessarily make you make a decision ***. It may and I don't want to say this, hypothetically speaking, it may be one of your better points, at least to get to the third stage. And I don't want you to waive that issue simply because you want me to hear this."

Judge Carlson stated that he did not want the case to be sent back because he had preconceived notions about the expert, stating, "while I think I can put certain feelings aside, there are certain things that came up in the testimony that struck a cord with me." Defense counsel asked Judge Carlson if he could recuse himself on just that one issue. Judge Carlson stated that it did not think "a judge can do a post-conviction petition piecemeal." Judge Carlson then said, "just being completely honest with everybody, I don't know how much of it is my preconceived views of the testimony of Dr. Plunkett, as well as the actual testimony of Dr. Plunkett, as well as what may come up in a third-stage hearing." Defense counsel stated, "Can I ask, if we were to waive those issues, I am not saying we are, but if we were going to waive the issue about Dr. Plunkett and the stipulation matter, would you be inclined to go forward on the third stage on the other issues?" Judge Carlson replied,

"I don't know if I can make that—that's almost like an advisory opinion on the motions. Because right now as they're pled, all of those things are in there and I don't know if I can say, well, if you took this out, I might do it, but if you

didn't—because, quite frankly, [the defendant], you will be back here for years dealing with this, if I do it that way, I think."

Judge Carlson continued,

"[T]he next thing that happens is the appellate court says, well, [defense counsel] withdrew those issues because the Court basically gave him the wink, wink, nod, no[d], that, oh, I will give you your hearing on these two, as long as you don't go forward with the other one. You see what I'm saying?

So here is what I'm inclined to do, I would probably send it over to Judge Goodman who deals with a lot of the issues, the post-conviction issues. If you want to talk about it with [the defendant], [defense counsel] and just get a status date on it."

Defense counsel then said, "My understanding, then, is there is nothing I can say or do to get \*\*\* you [to] keep the case is what you're telling me right?" Judge Carlson said,

"I just don't feel right because as much as—everybody has a due process interest in this. [The defendant], as much as you have a due process interest in this, the State has it as well. And I don't want anyone to ever look at my decision-making on this years from now as it being clouded by some of my personal opinions about people who testified in this case, if you know what I mean."

¶ 17    The case was reconvened in front of Judge Goodman in March 2018. The court asked the parties if they had any further argument, and they said no. The court then granted the State's motion to dismiss, stating:

"I did have an opportunity to read in its entirety what the factual procedural history is, as well as the facts and circumstances of this case as it proceeded to trial, and the nature of the charges.

So one of the things—I am going to pull this out—that basically what we are dealing with is that, for the second stage, rather [the defendant's] constitutional rights were violated, and he stipulates to a number of things that he is raising, basically ineffective assistance of counsel, the investigation of the source of the tip, and calling a witness, and the failure—or the failure of counsel, that he stipulated to the cause of death, and in this particular case, when you are talking about the cause of death—and I'm—I'm—to put this lightly, but from what I could gather, even the defenses call a witness that indicated the cause of death as it relates to the elements of the crime, I guess, to determine whether or not it was either an accidental or murder or intentional and such.

With all of that, the Court in a second stage is not to weigh a balance to evidence, but does it have a substantial showing of constitutional violation and whether or not—and we see in these types of cases that there was something that could not have been raised procedurally previously and I can't—based on all of the cases that I have read, and we know we have cases with DNA. We have cases with false confessions and such, but nothing that I have read thus far—although I can understand the concern here of what occurred at trial, but for the purposes of a second stage nothing is—this is not new. It's not based on innocence in this particular case. It's not based on new information that was—could not have been raised at an earlier proceeding."

14

¶ 18                                    II. ANALYSIS

¶ 19      On appeal, the defendant argues (1) his claims of ineffective assistance of counsel established a substantial showing of a constitutional violation and should have proceeded to a third-stage evidentiary hearing, (2) Judge Carlson should not have recused himself, and (3) the circuit court erred in dismissing the petition based on its conclusion that the defendant's claims could have been raised earlier.

¶ 20                    1. Substantial Showing of Ineffective Assistance of Counsel

¶ 21      Under the Post-Conviction Hearing Act (Act), a defendant may file a petition alleging that his constitutional rights were substantially violated in the proceedings which resulted in his or her conviction. 725 ILCS 5/122-1(a)(1) (West 2018). The petition must be verified by affidavit (*id.* § 122-1(b)), and the allegations in the petition must be supported by affidavits, records, or other evidence or explain its absence (*id.* § 122-2). "The dismissal of a postconviction petition is warranted at the second stage of the proceedings only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Hall*, 217 Ill. 2d 324, 334 (2005). "At this stage, 'the defendant bears the burden of making a substantial showing of a constitutional violation' and 'all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true.' " *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15 (quoting *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). We review *de novo* a second stage dismissal. *Hall*, 217 Ill. 2d at 334.

¶ 22      When raising an ineffective assistance of counsel argument, the defendant must show: (1) counsel's performance fell below and objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

"To satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment' and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999); [citation.] This is a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel. [Citations.] In addition, even when a defendant can show deficient performance, the second prong requires the defendant to show that he was prejudiced as a result. That is, a defendant must show that counsel's deficiency was so serious that it deprived him of a fair trial." *People v. Dupree*, 2018 IL 122307, ¶ 44.

¶ 23    In his postconviction petition, the defendant made four claims of ineffective assistance of trial counsel, that counsel was ineffective for: (1) calling an expert witness, (2) failing to stipulate to the cause of death, (3) failing to investigate a tip to the police, and (4) failing to investigate cell phone records and cell tower records. The defendant also alleged that appellate counsel was ineffective for failing to raise these issues on direct appeal. We will consider the adequacy of each claim in turn.

¶ 24                                a. Calling the Expert Witness

¶ 25    The defendant first contends that trial counsel was ineffective for calling Dr. Plunkett as an expert witness. The defendant contends that "[n]othing from this expert's testimony had any exculpatory value" and counsel knew or should have know that Plunkett's testimony would be harmful to the defendant's defense. We find that the decision to call Dr. Plunkett as an expert amounted to trial strategy as it cast doubt on multiple pieces of the State's evidence. First,

16

Plunkett's testimony cast doubt on how well Mitchell conducted the autopsy. Plunkett stated that Mitchell should have examined all the bruises microscopically to determine whether some of the injuries were older. Based solely on photographs, Plunkett believed that some of the bruises looked to have been previously inflicted.

¶ 26    Second, Plunkett called into question the cause of death. Plunkett stated that Mitchell's conclusion that Devin died as a result of cranial cerebral injuries due to multiple blunt force trauma to the head was a "reasonable conclusion" and that he "probably" would have came to the same conclusion. However, Plunkett did not think that such a conclusion was a "reasonable certainty." Based on the position that Devin was found, Plunkett believed that he could have died from positional asphyxia. Plunkett noted that none of the injuries in and of themselves would have been fatal, and that the position of the body likely made some of the injuries look worse than they were. While on cross-examination, Plunkett stated that "[t]o a reasonable medical certainty, Devin's death is a homicide" and had written that "someone beat the shit out of Devin," he could not "conclude *** with a reasonable degree of scientific and medical certainty that the beating was the actual cause of death."

¶ 27    Third, Plunkett also gave a larger range of the time for the infliction of the injuries, including a period of time when Julie or Bryan were alone with Devin. Plunkett stated that the injuries could have been inflicted within 24 to 48 hours before Devin died, but likely happened within 12 hours of his death. The fact that a given trial strategy ultimately proved unsuccessful does not constitute proof of ineffective assistance of counsel. *People v. Milton*, 354 Ill. App. 3d 283, 290 (2004). Based on all of the potentially positive expert opinions that Plunkett offered, counsel's decision to introduce him as an expert amounted to trial strategy and was not unreasonable.

17

¶ 28                                    b. Failure to Stipulate to Cause of Death

¶ 29        The defendant next contends that trial counsel was ineffective for failing to stipulate to

the cause of death. We find that this also amounted to trial strategy. Counsel sought to question

the cause of death and the validity of the autopsy. As stated above, Plunkett provided a potential

alternative cause of death and cast doubt on some of the methods that Mitchell had used,

particularly his failure to take a microscopic look at the bruises to determine their age. Had

counsel stipulated to the cause of death, the potentially helpful testimony of Plunkett would not

have been introduced. The court when rendering its decision made it clear that it understood that

the defendant was attempting to argue that Devin's death may have been accidental, stating:

"The defense believes sufficient evidence exists to suggest an accidental death, specifically a

fractured skull from an accidental fall in the bathtub or positional asphyxia when Dev[i]n was

accidentally wedged upside down between the wall and his bed or a combination of those

events." Moreover, the defendant provided no indication that the State would have agreed to

stipulate to the cause of death if trial counsel had wanted to do so.

¶ 30                                    c. Failure to Investigate a Police Tip

¶ 31        The defendant also alleges ineffective assistance of trial counsel for counsel's failure to

investigate a police tip that caused the police to search the defendant's work for clothing. The

defendant failed to attach evidence to support this claim as required by statute or explain why he

did not do so. 725 ILCS 5/122-2 (West 2018). After hearing arguments on the State's motion to

dismiss the petition, the court gave the parties until the next court date to supplement the record

with any evidence to support its claims. The defendant did not do so. Nowhere in the record does

it state that the police received a tip. "[T]here can be no substantial showing of ineffective

assistance of counsel for failure to investigate *** if there is no evidence that the exculpatory

18

evidence actually exists." *Dupree*, 2018 IL 122307, ¶ 37. Moreover, the defendant does not even allege that the police actually received a tip and that counsel knew or should have known about the existence of a tip. The defendant solely concludes that there must have been a tip in order for the police to search the location. He points to Campos's testimony that he was told by detectives to look for the clothing. The defendant states, "[s]uch testimony begs the question, where did these officers get this information if not from a tip." This amounts to speculation. There are other reasonable explanations for this information. For example, when interviewed by the police, the defendant told them that that morning he put on the same clothes he was wearing the night before (a T-shirt and jeans) and then went to work. The officers could have sought to investigate this claim by determining whether the defendant stashed any similar clothing that he had actually worn the night before. Because the allegation was not well-pleaded and was not supported by evidence, the defendant failed to make a substantial showing of a constitutional violation.

¶ 32                           d. Failure to Investigate Cell Phone and Cell Tower Records

¶ 33          Next, the defendant alleges that trial counsel was ineffective for failing to investigate Julie and Steven's cell phone records as well as the cell tower records to determine where Julie's phone was located on the night of the incident. The defendant concluded that the records "could substantiate [his] timeline of events thereby undermining [Julie's] claims of innocence." Again, the defendant's claim is not supported by any evidence to show that these records existed or would have been helpful to his case. See 725 ILCS 5/122-2 (West 2018); *Dupree*, 2018 IL 122307, ¶ 37. The court stated that it would allow the defendant to supplement the record with the records, but the defendant, again, did not do so, nor did he explain his failure to do so. There is no basis to conclude that trial counsel's investigation of the records would have produced evidence useful to the defense. It is pure speculation that obtaining the records would have

19

shown that Julie arrived home at an earlier time than her testimony. *People v. Brown*, 2017 IL App (1st) 150203, ¶ 30. Therefore, the defendant did not make a substantial showing of ineffective assistance of trial counsel.[1]

¶ 34                                    2. Judge Carlson's Recusal

¶ 35        Next, the defendant contends that Judge Carlson should not have recused himself. He contends that he was prejudiced by the recusal because Judge Carlson "intended to permit the proceedings to proceed to a third stage review," the recusal deprived the defendant of discovery, and resulted in "the cursory oral ruling denying [the defendant's] petition from Judge Goodman *sans* reliance on caselaw, statutes or even thorough reasoning."

¶ 36        "A judge should disqualify himself or herself where the judge's impartiality might reasonably be questioned ***." *People v. Kliner*, 185 Ill. 2d 81, 169 (1998). "[T]he trial judge is in the best position to determine whether he or she is prejudiced against the defendant." *Id.*

> "Whether a judge should recuse himself is a decision in Illinois that rests *exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code. All judges in Illinois are expected to consider, *sua sponte*, whether recusal is warranted as a matter of ethics under the Judicial Code." (Emphasis in original.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45.

¶ 37        We find no error in Judge Carlson's decision to recuse himself. The record makes clear that Judge Carlson was concerned about his impartiality considering his past with Dr. Plunkett

---

[1] The defendant also alleges that appellate counsel was ineffective for failing to raise the above four issues in the defendant's direct appeal. Because the issues do not have merit, we cannot say that appellate counsel's failure to raise them was patently erroneous. See *People v. Barnard*, 104 Ill. 2d 218, 231 (1984) ("it is not incompetence for counsel to refrain from raising issues which, in his judgment, are without merit, unless his appraisal of the merits is patently wrong."

20

and took great care in making his decision. He stated, "while I think I can put certain feelings aside, there are certain things that came up in the testimony that struck a cord with me." Stating, "just being completely honest with everybody, I don't know how much of it is my preconceived views of the testimony of Dr. Plunkett, as well as the actual testimony of Dr. Plunkett, as well as what may come up in a third-stage hearing." Judge Carlson stated,

> "I just don't feel right because as much as—everybody has a due process interest in this. [The defendant], as much as you have a due process interest in this, the State has it as well. And I don't want anyone to ever look at my decision-making on this years from now as it being clouded by some of my personal opinions about people who testified in this case, if you know what I mean."

The record shows that he was concerned about his impartiality and whether that impartiality would be questioned later on. It was entirely within Judge Carlson's determination to recuse himself, and he did not err in doing so.

¶ 38     In coming to this conclusion, we reject the defendant's claim that he was prejudiced by Judge Carlson's recusal. First, the only prejudice determination Judge Carlson needed to make was whether his history with Plunkett may have affected his impartiality and thus prejudiced the defendant. A judge need not consider whether a defendant would suffer prejudice *because* he recused himself. See *Kliner*, 185 Ill. 2d at 169. Second, even so, there is no merit to the defendant's claims of prejudice. There is no indication in the record that Judge Carlson intended to advance the defendant's claims to the third stage. The entire conversation about the third stage was speculative with regard what would happen with the Plunkett claim and the evidence the court would have to hear regarding that claim if the petition advanced to the third stage. Defense counsel even asked Judge Carlson if he would advance the claims to the third stage if counsel

21

dropped the Plunkett contention, and Judge Carlson refused to speculate. Moreover, Judge Carlson specifically gave the defendant time to supplement the record with any other evidence he wanted before the next court date. The defendant did not do so, nor did the defendant ever ask Judge Goodman if he could do so after Judge Carlson recused himself. Therefore, the defendant was not deprived of discovery. Third, we would be remiss if we did not note that, if Judge Carlson did not recuse himself and subsequently the defendant's petition was denied, the defendant undoubtedly would have questioned his decision not to recuse himself.

¶ 39                                3. The Court's Dismissal of the Petition

¶ 40        Lastly, the defendant contends that the court erred in dismissing the petition when it believed that the defendant's arguments could have been raised earlier.

> "At the second-stage proceedings, we review the trial court's decision under a *de novo* standard of review. [Citation.] Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning. [Citation.] *De novo* review is completely independent of the trial court's decision. [Citation.] *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform." *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151.

As stated above (*supra* ¶¶ 21-34), the defendant failed to make a substantial showing of a constitutional violation for any of his alleged claims. Therefore, the court properly granted the State's motion to dismiss, regardless of its reasoning for doing so.

¶ 41                                            III. CONCLUSION

¶ 42        The judgment of the circuit court of Will County is affirmed.

¶ 43        Affirmed.

22