THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANTE JOHNSON, Defendant-Appellant.

First District (1st Division)    No. 1—00—0483

Opinion filed April 29, 2002.—Rehearing denied June 19, 2002.—Modified opinion filed June 24, 2002.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jon J. Walters, and Julia S. Rodenkirch, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

Following a bench trial, defendant was convicted of attempted first degree murder (720 ILCS 5/8—4, 9—1 (West 1998)) and was sentenced to eight years' imprisonment. On appeal, defendant argues that: (1) he was denied effective assistance of counsel; (2) the State failed to prove him guilty of attempted first degree murder beyond a reasonable doubt; and (3) he was denied due process of law where the trial judge relied on improper evidence and failed to properly recall the evidence. For the following reasons, we affirm.

## BACKGROUND

Defendant was charged by indictment with one count of attempted

first degree murder (720 ILCS 5/8—4, 9—1 (West 1998)) in that he fired a handgun at Keenan Harris with intent to kill. Defendant was also charged with two counts of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 1998)) in that he: (1) knowingly or intentionally discharged a firearm in the direction of Harris; and (2) knowingly or intentionally discharged a firearm in the direction of a motor vehicle he knew to be occupied by Harris. Defendant waived his right to a jury and the matter proceeded to a bench trial.

In his opening statement, defense counsel suggested that the evidence would show discrepancies between the testimony of the State's witnesses and that Harris' credibility would be impeached. The following colloquy between the trial judge and defense counsel then ensued:

"THE COURT: Well, so I take from what you gave me very sketchy [sic] is part of your defense is going to [sic] throw as much on the wall as possible and see what sticks or do you have a specific reason why I would, you know, is there a theory out there, and if there is a confrontation are you saying that this was self-defense? Give me a hint as to what I am supposed to be listening to.

So your client is not the shooter, not involved, not there?

MR. PALMER [defense counsel]: Yes.

THE COURT: Not even there?

MR. PALMER: Yes."

The State then called Harris as its first witness. Harris testified that, at the time of the shooting, he knew the defendant only by the nickname "Poo." Harris was dating Bianca Pulliam at the time, and defendant was dating Bianca's sister Rene Pulliam. Harris met defendant through Harris' relationship with Bianca one or two weeks prior to the shooting.

Harris further testified that he had been driving a van southbound on State Street with his friend Ronald Evans and someone known only as "Ears" when he saw Bianca, Rene and defendant near 106th Street and State Street. As Harris began pulling over to talk to Bianca, defendant walked "into the middle of the street like on the yellow line" and "started flagging his hand down *** trying to stop the van." Defendant was on the driver's side of the van when Harris stopped.

Harris testified:

"I stopped the van and I opened up the door. And I asked him [defendant] if there was something that he had to say to me because somebody told me that he was looking for me so I asked him did he have anything to say to me."

According to Harris, defendant replied, "Yes," pulled an automatic handgun from his pants, pointed it directly at Harris, and started

shooting. Harris testified that he was still in the van with the driver's side door opened when defendant pointed the gun at him. Harris heard a gunshot, slammed the door, and turned right down 106th Street.

The first bullet struck the driver's door "right where [Harris] slammed it at, right by the driver's window," continued through the interior of the van and struck "the part of the side by the window, by the front windshield." The second bullet "came from the back window and went into the passenger's side, the front driver's passenger [*sic*] side." A third bullet struck the rear of the van. Several photographs depicting the damage to Harris' van were admitted into evidence.

Harris continued driving until he saw a police sergeant at 106th and Wentworth and stopped. Harris reported the incident to the police, provided a description of the shooter, and indicated that he knew the shooter as "Poo." The police then spoke with Bianca, who provided them with defendant's proper name. Later in the evening, the police called Harris and asked him to view a lineup. Harris identified defendant from that lineup as the shooter. At trial, Harris marked a photograph of the lineup to identify defendant. The photograph was admitted into evidence.

On cross-examination, Harris denied having told an Officer Howard that the shooter came from between two houses on the east side of State Street and fired several shots. Harris did not recall whether he had told the officer that Bianca had witnessed the occurrence. Defense counsel further questioned Harris about Harris' statements to the police as follows:

"Q. You didn't tell [the detectives] that as you pulled up Poo had flagged down the car.

A. Yes, I did.

Q. You told them that you actually started talking to Bianca, you pulled over and started talking to Bianca?

A. I told them that's what my intentions were.

Q. You told them while you were talking to her the passenger Ronald had said, oh shit, and then you looked over and saw the person you say was Poo firing shots?

A. That's before I got a chance to start talking to her. That's before.

Q. You didn't tell the detectives that they [*sic*] all occurred before you talked to Bianca, you told the detectives it happened while you were talking to Bianca?

A. When we got to that corner of 106th and State, Bianca was coming across the street. By then I was pulling off. Little Ronnie looked up. He was like by the middle in the street. That's when I leaned over. I opened the door, I asked him did he have something to say to me. That's when he said what he said and he shot up my van."

Defense counsel then questioned Harris regarding any animosity between Harris and defendant.

"Q. Now, let me ask you, you said that you opened the door to ask him if he had something to say. Was there some animosity between the two of you?

A. Actually, he had something to say to me because somebody said that he was broken in his car [sic]. I wanted to ask him. It was my first time seeing him [since hearing the rumor that defendant was looking for him]."

Harris testified that he did not have any problems with defendant. Defense counsel then asked, "Bianca didn't like [defendant], right?" Harris replied:

"They were speaking and talking like everything was reckoned. She didn't look towards him in the wrong way like they [sic] didn't like him or nothing."

Finally, Harris testified that the incident lasted two or three minutes from the time Harris first saw defendant until Harris drove off. Defense counsel asked, "And is it safe to say that during most of that time you were ducking and trying to avoid getting shot, correct?" Harris replied, "Yes sir. After he—I was trying to get out of there. I wasn't going to sit around there to get my van shot up and trying to get killed sitting around."

The State then called Bianca as a witness. Bianca testified that she was talking with her friend Mia, her sister Rene, and defendant when Harris approached in his van. Harris stopped after defendant "flag[ged] down the van." According to Bianca, Harris asked defendant whether defendant "ha[d] any animosity against [Harris]." Bianca did not hear defendant's response. Bianca testified that defendant pulled a gun out of his pants and "began shooting at [Harris'] gang."[1] Defendant began shooting at the van as Harris closed the van door. Bianca testified that the first bullet hit the window of the driver's side door, a second bullet hit the rear driver's side window, causing the window to begin to shatter, and a third bullet hit the back of the van.

On cross-examination, defense counsel asked Bianca whether there

---

[1]Although the State suggested in its opening statement that the evidence would show that defendant was "throwing gang signs" at Harris, no evidence was presented at trial that defendant or anyone else involved in the incident belonged to a street gang. Harris testified that he was not involved with a gang. The record provides no explanation for Bianca's reference to Harris' "gang," and it is unclear whether Bianca meant to suggest that Harris and his companions belonged to a street gang or whether she used the term "gang" in the more generic sense of "a number of individuals making up a group" (Webster's Third New International Dictionary 934 (1981)).

was any animosity between her and defendant. Bianca answered, "No." Defense counsel further questioned Bianca:

"Q. You didn't know of any animosity between [defendant] and [Harris], right?

A. Yes, before, before the shooting happened, yes.

Q. Had they had any altercations, the two of them?

A. No, they haven't seen each other."

The State then rested.

Defense counsel presented no witnesses, instead submitting the parties' stipulation that Officer Howard and Detective Sergeant Ramirez would testify, if called, to the information contained in their respective reports. Defense counsel indicated that the reports would impeach Harris' credibility. The reports were admitted into evidence and defendant rested. In closing, defense counsel argued that Harris' testimony was not credible because his testimony was inconsistent with the statements he provided to Officer Howard and Detective Sergeant Ramirez. Defense counsel further argued that Bianca "clearly wishe[d] to assist" Harris because she had been his girlfriend at the time of the shooting and thus her testimony lacked credibility.

The trial judge found defendant guilty of attempted first degree murder. The trial judge noted that defendant "with intent to kill *** shot at Keenan Harris with a handgun, which the court believes is a substantial step towards the commission of first degree murder." The trial judge further commented as follows:

"The facts all came out to me when he took that handgun in his hand there was some animosity. The Court did not hear any evidence other than some animosity.

But it's clear to me from the witnesses that they probably identified the defendant as the person who stood in the street by the driver's side, raised a handgun and fired three to five shots in the direction of the driver of that vehicle, Keenan Harris.

All the bullets and bullet holes in the van would indicate the specific intent of the defendant."

At his sentencing hearing, defendant provided a statement in allocution. Defendant informed the judge that, in proceeding to trial, defendant "wasn't trying to waste [the court's] time or just get out of something [he] had done," but had proceeded to trial because the charges had been "upgraded *** from aggravated discharge to attempt[ed] murder." The trial judge sentenced defendant to eight years in prison, commenting:

"I certainly think that when you raise a revolver or an automatic and fire at a motor vehicle driven by another person and it strikes the door of that car where the driver is sitting, I believe that you

aimed that gun with the intent to shoot the individual driving that car."

Defendant appeals.

## ANALYSIS

### I. Ineffective Assistance of Counsel

■ Defendant first argues that his trial attorney was constitutionally ineffective. In order to establish a claim of ineffective assistance of counsel, the defendant must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) counsel's shortcomings were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *People v. Albanese*, 104 Ill. 2d 504 (1984), adopting *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To meet the second prong of this test, a defendant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Nieves*, 192 Ill. 2d 487, 494 (2000).

A defendant must satisfy both prongs of the *Strickland* test and failure to establish either proposition will be fatal to the claim. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Moreover, judicial scrutiny of counsel's performance is highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 319-20 (1997).

■ Defendant first argues that his trial counsel was ineffective for cross-examining both Harris and Bianca with respect to "animosity" between defendant and Harris. According to defendant, the testimony regarding animosity elicited by defense counsel was critical to the court's finding that defendant fired the gun with the intent necessary to convict him of attempted first degree murder. Trial counsel's decisions regarding how to cross-examine a witness involve the exercise of professional judgment and are entitled to substantial deference from a reviewing court. *Pecoraro*, 175 Ill. 2d at 326-27. Trial counsel's approach to cross-examination supports a claim of ineffective assistance of counsel only if that approach is objectively unreasonable. *Pecoraro*, 175 Ill. 2d at 327. The record in this case reflects that defense counsel's primary trial strategy was to challenge the credibility of the State's witnesses. Eliciting evidence of animosity between defendant and Harris served this strategy by suggesting that Harris might have a motive for testifying falsely against defendant. We find nothing objectively unreasonable in this approach.

Further, even if we were to find that defense counsel's cross-examination was objectively unreasonable, defendant was not prejudiced by the evidence of animosity elicited by defense counsel on cross-examination. Harris testified on direct examination that he had asked defendant if defendant "had something to say" to Harris and that defendant had responded by saying, "Yes," and pointing a gun at Harris. This exchange was certainly evidence of animosity between defendant and Harris. Because the testimony of Bianca and Harris on cross-examination regarding animosity was merely cumulative of Harris' testimony on direct examination, we cannot say that, but for defense counsel's cross-examination, the result of the proceeding would have been different. *People v. Page*, 193 Ill. 2d 120, 145 (2000).

■ Defendant next argues his trial counsel was ineffective for failing to make a hearsay objection. Defendant argues that trial counsel should have objected when Harris testified on direct examination that "somebody told me that [defendant] was looking for me so I asked [defendant] did he have anything to say to me. *** [Defendant] said yes *** and pulled out a gun." We note that this testimony includes: (1) a statement by "somebody" who is not identified; (2) a question posed by Harris; and (3) defendant's response. Defendant fails to identify the specific portion of this testimony that he claims was inadmissible hearsay.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Rodriguez*, 312 Ill. App. 3d 920, 928 (2000). Defendant's response, "yes," does not constitute inadmissible hearsay because a defendant's own statements offered against the defendant are admissible as party admissions. *People v. Grisset*, 288 Ill. App. 3d 620, 630 (1997). Trial counsel was thus not ineffective for failing to object to testimony regarding defendant's response. Because Harris' question ("did [defendant] have anything to say to [Harris]") is not a statement asserting any facts but rather is a request for a statement from defendant, this question does not constitute hearsay. *People v. Roti*, 2 Ill. App. 3d 264, 270 (1971) ("It is fundamental that extra-judicial statements become hearsay only when they are 'assertions' ***"). We find no ineffectiveness in defense counsel's failure to object to both Harris' and Bianca's testimony that Harris asked this question.

Arguably, the testimony that "somebody told [Harris] that [defendant] was looking for [Harris]" was offered to explain why Harris asked defendant if "he had anything to say to [Harris]" and not to prove that defendant was in fact looking for Harris. Where an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay. *People*

*v. Albanese,* 102 Ill. 2d 54, 70 (1984). Even assuming *arguendo* that the statement that defendant was looking for Harris was hearsay, counsel's failure to object does not support a finding that counsel was ineffective. The determination of which objections to raise is a matter of trial strategy. *People v. Pecoraro,* 144 Ill. 2d 1, 13 (1991). The testimony that defendant was looking for Harris suggests some animosity between defendant and Harris. As noted above, defense counsel sought to use evidence of animosity between defendant and Harris to challenge the credibility of Harris' testimony. For the reasons delineated above, this strategy was neither objectively unreasonable nor prejudicial to defendant.

■ Defendant next argues his trial counsel was ineffective for failing to object to "leading questions \*\*\* based on defense-damaging facts not in evidence." Specifically, defendant complains that the State asked Harris: (1) "How many shots would you say that the defendant fired *at you* in your van?" (2) "Did anybody else other than the defendant shoot *at you*?" and (3) "Did all [of the bullet damage to Harris' van] exist before the defendant started shooting *at you*?" (Emphasis added.) Defendant contends that each of these questions assumed without substantiating evidence that defendant shot at Harris rather than merely at Harris' van. By failing to cite any authority for the proposition that such questions were improper, defendant has waived this argument on appeal. 177 Ill. 2d R. 341(e)(7); *People v. Bock,* 242 Ill. App. 3d 1056, 1080-81 (1993).

■ Finally, defendant argues that his trial counsel was ineffective because counsel introduced into evidence a police report that directly undermined the defense theory introduced during opening statement that defendant was not present at the shooting. At trial, defense counsel offered a report authored by Detectives Ramirez and Foster into evidence to highlight certain alleged inconsistencies between Harris' testimony and the statements Harris had made to the detectives. The report also notes that the detectives interviewed defendant and summarizes this interview as follows:

> "[Defendant] said he had been in the area of 106th and State after he and his girlfriend Reena [*sic*] were picked up from the Bridgeview Court by his friend Mike. \*\*\* Defendant was driven to the area of 106th and Mike parked his car in the alley near State St. Mike left for a short time leaving [defendant] in the car with Reena [*sic*], [Mike] came back running and they all left the area. [Defendant] was driven home and he stayed there."

We reject defendant's contention that introduction of this report undermined his defense and rendered his counsel ineffective. Although the report notes defendant's statement that he was in a parked car in

an alley *near* the scene of the shooting, nothing in the report indicates that defendant was present *at* the scene of the shooting. Further, the report contains no indication as to *when* defendant was in the alley at State Street and 106th. Defense counsel never asserted that defendant had never been in the area where the shooting occurred, only that defendant was not present at the scene of the shooting. The statement in the detectives' report is not inconsistent with this defense and thus defendant has failed to establish that his trial counsel was ineffective for placing the report into evidence.

## II. Reasonable Doubt

■ Defendant next contends that "setting aside the improper hearsay evidence and the State's leading questions based on facts not in evidence," the State failed to present evidence that defendant acted with intent sufficient to support a conviction for attempted first degree murder. We have already concluded that defendant has waived any argument that the State asked improper leading questions. We also have explained that only the testimony that "somebody" told Harris that defendant was looking for Harris could arguably be construed as hearsay but that the statement did not prejudice defendant. We note here that, although defendant argues that trial counsel was ineffective for failing to object to the alleged hearsay, defendant does not argue on appeal that admission of the alleged hearsay statement was reversible error. Illinois law holds, however, that when determining the sufficiency of the evidence, *all* evidence submitted at the original trial— including improperly admitted evidence—may be considered. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

■ We find sufficient evidence in the record to establish defendant's guilt even without considering the matter that defendant asks us to set aside. In reviewing the sufficiency of the evidence to support a criminal conviction, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A person commits attempted first degree murder when he performs any act that constitutes a substantial step toward the killing of an individual and in performing such act: (1) intends to kill or do great bodily harm to that individual or another; (2) knows that such act will cause death to that individual or another; or (3) knows that such act creates a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/8—4, 9—1(a) (West 1998).

■ Defendant first argues that the trial judge's comments at the sentencing hearing demonstrate that the judge's finding of intent was

based upon an inaccurate recollection of the evidence produced at trial. At sentencing, the trial judge commented:

"I certainly think that when you raise a revolver or an automatic and fire at a motor vehicle driven by another person and it strikes the door of that car where the driver is sitting, I believe that you aimed that gun with the intent to shoot the individual driving that car."

Defendant argues in his brief that the trial judge's comment is inconsistent with evidence that the "van door was swung open when shot—not closed next to [Harris] in the driver's seat." We disagree. The trial judge's comments reflect no opinion as to whether the door was open or closed when struck by the first bullet. A careful reading of the trial testimony demonstrates that the driver's door was in the process of being closed as the first shot was fired. No testimony was presented that the door was *fully* open and away from Harris when it was struck by defendant's first shot. We thus find no inconsistency between the trial judge's comment and the evidence produced at trial.

■ Defendant further argues that the State's evidence established only that defendant shot in the direction of Harris's van or at most "in the direction of" (and not "at") Harris and thus the State failed to establish that defendant shot with the intent necessary to support a conviction for attempted murder. Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986). Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life. *Winters*, 151 Ill. App. 3d at 405. It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears there exists a reasonable doubt as to the defendant's guilt. *Winters*, 151 Ill. App. 3d at 406.

Harris testified that defendant pointed the handgun directly at him. Bianca testified that defendant was "shooting at [Harris'] gang."[2] Both Harris and Bianca testified that: (1) the first bullet fired by de-

---

[2]Defendant notes this testimony in his brief, but modifies the quotation to indicate that defendant was shooting at Harris' "gang [van]." Defendant offers no explanation for the inclusion of the bracketed material and offers the modified quote as support for his argument that the testimony elicited by the State demonstrated only that defendant shot at *the van* and not at Harris or any other person. The term "gang" commonly refers to "a number of individuals making up a group." Webster's Third New International Dictionary 934

fendant struck the driver's door of the van and proceeded through the interior of the van to the edge of the front passenger side window abutting the windshield; and (2) a second bullet fired by defendant struck the rear driver's side window of the van and proceeded through the interior of the van into the front passenger seat. The photographs of the damage to the van that were admitted into evidence corroborate this testimony. Indeed, after examining the photographs, we find the trial judge's conclusion that defendant was aiming at Harris when he fired the gun is all but inescapable. While none of the shots fired by defendant actually struck Harris, poor marksmanship is not a defense to attempted first degree murder. *People v. Green*, 322 Ill. App. 3d 747, 755 (2001). Evidence that a defendant discharged a firearm in the direction of another individual, either with malice or total disregard for human life, is sufficient to support a conviction for attempted first degree murder. *People v. Sowewimo*, 276 Ill. App. 3d 330, 340 (1995).

■ Defendant next argues that, by creating the offense of aggravated discharge of a firearm (Pub. Act 86—1393, § 1, eff. September 10, 1990 (adding 720 ILCS 5/24—1.2)), the legislature "plainly altered the availability of *** [an] inference" that a person who discharges a firearm in the direction of another does so with the intent to kill. We disagree. The language used by the legislature is the best indicator of legislative intent. *People v. Savory*, 197 Ill. 2d 203, 212 (2001). Nowhere does section 24—1.2 of the Criminal Code of 1961 refer to the offense of attempted first degree murder or otherwise suggest any legislative intent to alter well-established law applicable to attempted first degree murder. 720 ILCS 5/24—1.2 (West 1998). Further, subsequent to the enactment of section 24—1.2, the appellate court has continued to hold that evidence that a defendant discharged a firearm in the direction of another individual, either with malice or total disregard for human life, is sufficient to support a conviction for attempted first degree murder. *Sowewimo*, 276 Ill. App. 3d at 340; *People v. Stokes*, 293 Ill. App. 3d 643, 650 (1997); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994). We hold that this principle is unaffected by the enactment of section 24—1.2 of the Criminal Code.

After carefully reviewing the evidence presented at trial in the light most favorable to the prosecution, we conclude that the State presented sufficient evidence to prove defendant guilty of attempted first degree murder beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261.

---

(1981). We find absolutely nothing in the record to support defendant's apparent inference that the term "gang" as used by Bianca referred to Harris' *van* rather than to the *group of individuals* occupying Harris' van.

## III. Due Process

Finally, defendant argues that "the record affirmatively shows two due process errors" committed by the trial judge. First, defendant claims that the trial judge violated due process by relying on "incompetent hearsay 'animosity' evidence in finding [defendant] guilty of attempt[ed] murder." Defendant provides neither argument nor citation to authority in support of his claim that the trial judge violated defendant's right to due process by considering the evidence at issue. This first due process challenge is waived. *Bock*, 242 Ill. App. 3d at 1080-81.

Defendant also argues, relying on *People v. Bowie*, 36 Ill. App. 3d 177 (1976), that he was deprived of due process because the trial judge's comments during sentencing demonstrate that the judge did not accurately recall the evidence. In *Bowie*, the court held that a defendant is denied due process "[w]here a record affirmatively indicates *** that the trial judge did not remember or consider the crux of the defense when entering judgment." *Bowie*, 36 Ill. App. 3d at 180. As explained above, the record in the instant case does not affirmatively indicate that the trial judge failed to accurately recall the evidence. Defendant has failed to establish a due process deprivation.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

TULLY and COUSINS, JJ., concur.