2021 IL App (1st) 171454-U

No. 1-17-1454

Order filed March 26, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 8276 |
| | ) | |
| PARIS WICKS, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SHARON ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirmed the second stage dismissal of defendant's successive postconviction petition where defendant failed to establish prejudice from trial counsel's cross-examination of a State's witness; thus, defendant failed to make a substantial showing of appellate counsel's ineffectiveness.

¶ 2    Defendant Paris Wicks[1] appeals from the second stage dismissal of his successive postconviction petition on the State's motion. On appeal, he contends that the trial court's dismissal should be reversed where he made a substantial showing that appellate counsel was ineffective for failing to argue that defendant's trial counsel rendered ineffective assistance when he elicited damaging identification testimony from Brandon Lemon (Lemon), one of his codefendants. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4                              A. Procedural Background

¶ 5    Following a jury trial, defendant was convicted of first degree murder for the shooting death of Adrian Uriostegui (decedent) and sentenced to 40 years' imprisonment. His conviction and sentence were affirmed on direct appeal. *People v. Wicks*, 1-02-2429 (2004) (unpublished order under Supreme Court Rule 23). On January 7, 2005, through counsel who had represented him on direct appeal, defendant filed a postconviction petition. That petition was summarily dismissed on March 14, 2005. We affirmed the dismissal on September 20, 2006. *People v. Wicks*, No. 1-05-1145 (2006) (unpublished order under Supreme Court Rule 23). Defendant's petition for leave to appeal was denied on March 1, 2007.

¶ 6    Defendant filed a *pro se* motion for leave to file a successive postconviction petition on January 5, 2009. The trial court denied leave in a written order on March 6, 2009. This court reversed and remanded the matter for second stage postconviction proceedings on October 12,

---

[1] Although defendant is referred to in the notice of appeal as "Paris Wicks-El," our review of the record reveals no documented basis for the change of his last name and that is the only document where he is referred to by a different last name. Accordingly, we shall continue to refer to defendant as "Paris Wicks," consistent with how he was identified in all prior proceedings.

2010. *People v. Wicks*, No. 1-09-0940 (2010) (unpublished order under Supreme Court Rule 23). Appointed counsel filed an amended postconviction petition. On April 20, 2017, the trial court granted the State's motion to dismiss the petition. This appeal followed.

¶ 7                                B.  Factual Background

¶ 8      On March 6, 1998, the decedent was shot and killed at the corner of Hollywood and Clark in Chicago. Shortly thereafter, police went to a nearby apartment and arrested a group of teenagers, including defendant, who was 16 years old at that time. After being identified in a lineup, defendant made an inculpatory statement. Defendant was charged, along with codefendants Lemon, Dakari Williams (Williams), William Cox (Cox), Joseph Nolen (Joseph), and Alvine Nolen (Alvine), with first degree murder, attempted first degree murder, and aggravated discharge of a firearm. Defendant's pre-trial motions were denied.

¶ 9      At trial, Kerri Ellis (Ellis) testified that she was walking west on Hollywood towards Clark at approximately 6:40 p.m. on March 6, 1998, behind two African-American boys, one of whom was light-skinned with a big nose and taller than the other boy. The taller boy looked back at her, told the shorter boy that it was okay, and the shorter boy crossed the street and joined three other African-American boys. Ellis passed the taller boy before reaching the corner and she crossed Clark and entered a restaurant to pick up a food order. When she exited the restaurant, a Hispanic boy she had never seen before started screaming and staring at her. Ellis testified that the group she saw earlier was running east on Hollywood. She heard someone say that the Hispanic boy had been shot, so she said to call the police. When police arrived, Ellis told them about the group of boys running down Hollywood, and that the tall boy she saw had short hair and a big nose.

¶ 10    Corrine John (John) testified that at approximately 6:40 p.m. on the day of the shooting, she was on the back porch at her apartment located at 1413 West Hollywood when she heard running and saw four African-American men run through the gangway, kitty-corner through the alley. They wore dark coats, and one man wore a coat with a yellow stripe. When the police arrived 10 minutes later, she described the man in the coat with the yellow stripe to them.

¶ 11    Armando Correa (Correa) testified that he and the decedent were members of the Latin Kings at the time of the shooting.  They were walking north on Clark toward Hollywood when they passed defendant standing outside of a bar. As they walked past the bar, Correa looked at defendant's face. When Correa and the decedent reached the corner, he heard three gunshots from behind them.  Correa looked back after the second gunshot and saw defendant pointing a black gun with a brown handle at the decedent. Defendant ran past Correa after the shooting, heading east on Hollywood towards three other males who were coming up the alley. When the police arrived, Correa told them what he saw and shortly thereafter, identified defendant as the shooter in a lineup.  Correa also identified defendant in court as the shooter.

¶ 12    On cross-examination, Correa admitted that it was dark outside when the shooting happened but said that the lighting conditions were good enough to see someone's face.  Correa also admitted that he was told there was a suspect in custody before viewing the lineup and based on that, he expected to see the shooter.

¶ 13    Chicago police officer Janice Scott testified that on March 6, 1998, she and her partner went to the area of 5701 North Clark at 6:40 p.m. in response to a call of shots fired.  When they arrived, they spoke to witnesses, including Correa, and sent out a flash message that the shooter

was a light-skinned African-American male, approximately 18 years old, six feet tall, 165 pounds, wearing a dark blue baseball cap and jacket, and dark blue jeans.

¶ 14    Chicago police officer Robert Bridges testified that on March 6, 1998, at 6:40 p.m., he and his partner Officer Melchiori received a call of a man shot on Hollywood. Based on information received from John, Melchiori went to the front of 5644 North Glenwood, where he saw an African-American male wearing a black jacket with yellow stripes, whom he later learned was Lemon. After arresting Lemon, Officer Bridges went to the second floor of 5644 North Glenwood where he found three African-American males, one of whom was defendant.  All three were taken into custody and taken to the police station.

¶ 15    Chicago police sergeant Michael Ogliore testified that he was assigned to the 20th District and was familiar with the territories of the Conservative Vice Lords and Latin Kings. On the evening of the shooting, Sergeant Ogliore received information that led him to proceed to 6424 North Greenview, where he found and arrested Alvine.

¶ 16    Chicago police officer Philip Gonzalez testified that he and his partner responded to a call of shots fired at 5701 North Clark.  While canvassing the area, he received a call from Officer Pat Cain, which led him to go to an apartment at 5882 North Ridge and look for a person named "Dakari" and a gun. At the apartment, Officer Gonzalez and Officer Cain encountered a young lady named "Kisha" and Williams. Kisha motioned Officer Cain towards a stack of boxes in the hallway, where he recovered a gun. Kisha and Williams were both taken into custody.

¶ 17    Chicago police officer William Moore testified that he was a forensic investigator assigned to the Cook County Medical Examiner's Office (Medical Examiner's Office) on March 7, 1998.

On that date, he went to the morgue to collect a bullet envelope from the pathologist, who had collected evidence from the decedent's body.

¶ 18 Detective Robert Labbe testified that at 6:50 p.m. on March 6, 1998, he was assigned to investigate the shooting at Hollywood and Clark. While he was at the scene, the evidence technicians arrived and recovered a .32 caliber casing. Detective Labbe later learned from other officers that a .32 caliber weapon was recovered from a nearby location. At approximately 4:30 a.m. the following morning, he and an Assistant State's Attorney (ASA) interviewed Lemon with Lemon's mother present. At the conclusion of the interview, the ASA took a handwritten statement from Lemon, who read and made changes to it before he and his mother signed each page of the statement. Lemon was never promised anything in return for his statement, nor did Lemon appear to be under the influence of alcohol or drugs.

¶ 19 Dr. Nancy Jones of the Medical Examiner's Office testified that she performed an autopsy on the decedent. She determined that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

¶ 20 No latent fingerprints were found on the recovered gun, magazine, pouch, two live cartridges, or discharged cartridge case. Tests revealed that the fired cartridge recovered from the scene had at one time been chambered in the recovered gun, and that the bullet recovered from the decedent's body had the same characteristics as the gun. However, tests were inconclusive as to whether the bullet was fired from the weapon.

¶ 21 Lemon, a codefendant, testified for the State that he was incarcerated after he pled guilty to murder of the decedent a year earlier. He stated that at the time of the shooting, he was 16 years old and lived at 5644 North Glenwood with his parents and was a member of the Conservative

Vice Lords. Lemon stated that he and defendant were friends. He also testified that the area of Clark and Ridge was Vice Lords territory, and at the time of the shooting, the Vice Lords were at war with the Latin Kings, whose territory was near Hollywood and Clark.

¶ 22    Lemon testified that he knew Williams, a/k/a "Cheese;" Joseph, Alvine a/k/a Alvin[2]; and Cox, a/k/a "Country." Lemon stated that prior to the shooting, stated that they were all present at a gang meeting at William's apartment, but he refused to say whether defendant was at the meeting. The State confronted Lemon with his prior handwritten statement that was made to police the day after the shooting, which he acknowledged signing. Lemon admitted that the statement indicated that defendant was present at the meeting and that gang business was discussed. Lemon acknowledged that he, his mother, the ASA and a detective signed each page of the statement and that the photograph attached to the statement was of he and his mother, taken after they signed the statement.

¶ 23    Lemon refused to say whether a decision was made at the meeting to kill a Latin King, and he refused to answer the State's questions about what his prior statement said about the matter. He requested to be taken back to jail and indicated to the trial court that he was refusing to answer because he was "mad" and that "[they] should've notified [him]." After Lemon refused to answer the State's next three questions, the trial court directed Lemon to answer the questions, but Lemon continued to refuse to answer. The court then stopped the State's questioning.

¶ 24    Outside the presence of the jury, the trial court ordered him to answer or face contempt, but Lemon still refused. The trial court indicated that there was no reason to put him back on the stand, but she offered defense counsel an opportunity to cross-examine Lemon on what had already

_____

[2] We shall continue to refer to codefendant as Alvine throughout our discussion.

been elicited. The trial court stated that it would allow the State to examine Lemon further if he started to answer questions. The State also indicated that it wanted to question Lemon regarding the transcript of his guilty plea.

¶ 25    During defense counsel's cross-examination, which is the subject of this appeal, Lemon was questioned about the origins of his statement, and Lemon claimed that the ASA told him he could go home if he signed the statement. Lemon also stated that the police assaulted him while he was at the station. Defense counsel asked Lemon who was present when the ASA made promises to him and brought out that Lemon made certain statements to the police because he thought that would allow him to go home. Lemon admitted that his statement indicated that defendant and "Cheese" were across the street together, that "Cheese" nodded at defendant when they saw the decedent, and defendant then started shooting at the decedent.

¶ 26    On redirect examination, Lemon testified that he was drunk and high at the time of his statement and that not all of it was true. However, he also acknowledged that at his guilty plea hearing, he swore that his written statement was true and accurate regarding his and his codefendants' involvement in the shooting. Lemon also acknowledged that at his guilty plea hearing, he testified under oath regarding their involvement in the shooting: the six men arrested in conjunction with the shooting, including defendant, were members of the Conservative Vice Lords gang; they all attended a gang meeting prior to the shooing; they walked to Hollywood and Clark to search for rival Latin King members; and Alvine gave defendant a .32 caliber semiautomatic handgun. Lemon first refused to answer, and then claimed he could not remember whether the group decided they would shoot a Latin King in retaliation for an earlier incident. He also refused to answer whether he testified at his guilty plea hearing that it was true that defendant

and Williams approached the decedent, defendant shot him three times, then the group fled the scene. Lemon claimed that the State was wasting its time because he had nothing to say and was ready to return to the penitentiary.

¶ 27 The court reporter from Lemon's guilty plea hearing, Christine Rockwell, testified for impeachment purposes as to those portions of the plea that Lemon refused to answer or stated that he could not remember. She testified that on April 4, 2001, she was the official court reporter in Circuit Court Judge Clayton Crane's courtroom when Lemon pled guilty to murder in case number 98 CR 8276. Rockwell read the following from the transcript of the plea hearing:

"During the course of the meeting the arrestees decided that they were going to the Latin Kings area, a rival gang area near Clark and Hollywood and shoot a Latin King in retaliation for an earlier incident. * * * Finally [defendant] and Dakari Williams saw the victim. The offenders approached the victim and [defendant] shot the victim three times. All the offenders fled the scene. Several of the offenders were subsequently located by members of the 20th District gang unit and placed under arrest."

¶ 28 Kisha Dickerson-Gonzalez testified that on March 6, 1998, she was Williams' girlfriend and lived with him at 5882 North Ridge in Chicago. At approximately 6 p.m. that evening, she was in the front room of their third-floor apartment with Williams and several of his friends, including Alvine, "Country," and defendant. Williams and his friends left the apartment after 6 p.m. but Alvine returned later and gave her a black gun with a brown handle. Kisha took the gun, placed it inside a black bag and put the bag between two boxes. Williams returned home shortly thereafter. When the police came to the apartment later that evening, Kisha told them where she hid the gun and both she and Williams were taken to the police station.

¶ 29    On cross-examination Kisha admitted that she did not tell the truth when she told police that defendant gave her the gun prior to telling them that Alvine gave it to her because she was afraid. She also admitted telling police that a man named "Sam" gave her the gun.

¶ 30    Detective James Gildea testified that while he escorted defendant to an interview room after the lineup on March 6, 1998, defendant confessed that he shot the decedent in retaliation for an earlier incident when members of the Latin Kings gang chased and harassed him. Later that evening, defendant gave an inculpatory statement to Detective Gildea, Detective Turney, and Youth Officer Rivera. Detective Gildea was also present in the interview room when ASA Markakos gave defendant his *Miranda* rights and interviewed him, though he was not present for the entire conversation. The ASA did not promise defendant anything or threaten him.

¶ 31    Konstantinos Markakos, a criminal defense attorney at the time of defendant's trial, testified that he was an ASA on March 6, 1998, and was assigned to investigate the shooting. At 11:55 p.m. that night, he, Detective Turney and Youth Officer Rivera spoke with defendant. Defendant told them that he was a member of the Vice Lords gang and on the day of the shooting, he attended a gang meeting where the decision was made to shoot a Latin King in retaliation for an earlier incident. At the meeting, a gang member named Alvine took the gun, but defendant had decided to do the shooting. Defendant and five other gang members, including Alvine and "Cheese," left the meeting and went looking for Latin Kings to shoot. Defendant took the gun from Alvine and when they saw the decedent and another boy walking by on Clark near Hollywood, defendant shot the decedent at least two times. He shot the decedent because "it did not matter which one to shoot at, because they are all the same." At the conclusion of the interview, ASA Markakos memorialized defendant's statement in a handwritten document, he reviewed it

with defendant, and had defendant sign the document sometime after 3 a.m. on the morning following the shooting.

¶ 32   ASA Markakos testified that he first spoke to defendant at approximately midnight after speaking to defendant's father.  While ASA Markakos denied that he spoke to defendant before his father arrived at the police station, he admitted that he authored a felony review memo that indicated defendant gave an oral statement to him, Detective Turney and Youth Officer Rivera regarding the shooting, after which, defendant's father arrived at the station.

¶ 33   Following the admission of exhibits into evidence, the State rested its case-in-chief. Defendant moved for a directed verdict, which was denied.

¶ 34   The defense proceeded by stipulation.  The parties stipulated that if called to testify, Officer Fred Snyder would testify that on March 6, 1998, he interviewed Ellis and that his police report does not indicate the complexion of the two boys or whether one boy was taller than the other.  It was further stipulated between the parties that Detective Labbe would testify that on March 6, 1998, he interviewed Kisha and that his report of the incident reflects that the man "Sam," from whom Kisha stated she got the gun, was light complected.

¶ 35   Following closing arguments, the jury found defendant guilty of first degree murder and not guilty of aggravated discharge of a firearm. Defendant's motion for new trial was denied.  After hearing evidence in aggravation and mitigation, the trial court sentenced defendant to a 40-year prison term.

¶ 36                                      C. Direct Appeal

¶ 37   On direct appeal, defendant contended that: (1) his statement should have been suppressed because he was questioned and gave a statement without the presence of a parent or youth officer;

(2) the general description of the offender was insufficient to justify his arrest; (3) his trial counsel was ineffective for failing to request that an eyewitness instruction be tendered to the jury; and (4) his sentence was excessive. We affirmed defendant's conviction and sentence. *People v. Wicks*, No. 1-02-2429 (2004) (unpublished order under Supreme Court Rule 23).

¶ 38                          D.  Initial Postconviction Petition

¶ 39    As noted above, defendant's initial postconviction petition was filed on January 7, 2005, by the same attorney who represented him on direct appeal. Defendant's initial petition alleged ineffective assistance of trial counsel for failing to allege that defendant was unfit to give a statement for trial and sentencing.  The trial court summarily dismissed that petition as frivolous and patently without merit on March 14, 2005. We affirmed the dismissal of defendant's initial postconviction petition on September 20, 2006. *People v. Wicks*, No. 1-05-1145 (2006) (unpublished order under Supreme Court Rule 23).  Our supreme court denied defendant's petition for leave to appeal on March 1, 2007.

¶ 40                    E. Initial Successive Postconviction Petition Proceedings

¶ 41    On January 5, 2009, defendant sought leave to file a *pro se* successive postconviction petition alleging that he received ineffective assistance of appellate counsel for failing to raise on direct appeal that:  (1) he was arrested without probable cause; (2) the State made improper closing arguments; (3) the jury returned inconsistent verdicts; (4) trial counsel was ineffective for failing to properly file a motion to suppress statements; (5) the jury had evidence of defendant's moral, intellectual and emotional deficiencies and his use of psychotropic medications at the time of his confession; (6) trial counsel failed to request a fitness hearing to determine if defendant had the ability to make a knowing and voluntary confession or a knowing and intelligent waiver of his

*Miranda* warnings; (7) trial counsel failed to introduce evidence of involuntary intoxication and request jury instructions for involuntary intoxication; (8) portions of the felony review folder and impeaching witness statements were withheld from defendant in violation of his Sixth Amendment right to confront witnesses; (9) trial counsel improperly questioned a State witness during trial; and (10) trial counsel should have sought to re-open the motion to suppress statements after being presented with impeaching evidence against ASA Markakos. Defendant argued that he should be exempted from the procedural bar against successive petitions because he was represented by the same attorney during both his direct appeal and first postconviction proceeding. The trial court denied defendant leave to file the successive petition on March 6, 2009, finding that defendant failed to satisfy the cause-and-prejudice test under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)).

¶ 42                   F. Appeal of Denial of Leave to File Successive Petition

¶ 43   Defendant appealed the denial of his request for leave to file a successive postconviction petition, contending that the trial court erred in analyzing his petition as a successive petition when he was represented by the same attorney on direct appeal and in his first postconviction proceeding. The State conceded that defendant may properly raise his ineffective assistance of counsel claim in a second petition but asked this court to affirm the judgment because the petition was meritless.

¶ 44   We agreed with defendant, noting that defendant could not have raised issues of his appellate counsel's effectiveness during his first postconviction proceeding as it would have placed counsel in the position of having to allege and argue his own ineffectiveness. Additionally, we found that nothing in the record indicated that the trial court dismissed the petition as frivolous or patently without merit, as required by the summary dismissal procedure in the Act (725 ILCS

- 13 -

5/122-2.1(a)(2) (West 2008)), and further that if the petition was not summarily dismissed, it must proceed to the second stage of proceedings (725 ILCS 5/122-2.1(b) (West 2008)). Accordingly, we reversed the judgment of the trial court and remanded for second stage proceedings. *People v. Wicks*, No. 1-09-0940 (2010) (unpublished order under Supreme Court Rule 23).

¶ 45                    G. Second Stage Postconviction Proceedings

¶ 46    On remand, defendant was appointed counsel, who filed an amended petition and a Rule 651(c) (eff. Feb. 6, 2013) certificate on July 7, 2016. The amended petition supplemented defendant's allegations that appellate counsel was ineffective for failing to claim: (1) prosecutorial misconduct based on the State's closing argument and that trial counsel was ineffective for failing to object to remarks made by the State during closing argument; (2) that trial counsel was ineffective for not requesting a fitness hearing; (3) that trial counsel was ineffective for not arguing and presenting evidence of defendant's psychological deficiencies and involuntary intoxication at the time of the offense; (4) that trial counsel was ineffective for eliciting damaging prior identification evidence of defendant during cross-examination of Lemon; and (5) that the trial court erred in denying trial counsel's request to file the State's felony review folder under seal.

¶ 47    The State filed a motion to dismiss on January 3, 2017, contending that defendant failed to allege a cognizable constitutional claim under the Act and did not show prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 48    On April 20, 2017, after hearing the parties' arguments and reviewing the entire record, the trial court indicated that it would address defendant's claims raised in his successive petition under the standard for an initial postconviction petition based on this court's remand, which allowed those claims to be raised for the first time. Stating that the standard was whether defendant made

a substantial showing of a constitutional violation, the court found that he did not because under *Strickland*, defendant did not suffer prejudice from appellate counsel's decision not to raise certain issues on appeal unless such issues were meritorious. The court then examined each of the claims raised in defendant's postconviction petition and ruled as follows: (1) defendant failed to make a substantial showing that he was arrested without probable cause; (2) defendant failed to make a substantial showing that the State's remarks during closing were improper because they were merely persuasive statements and reasonable inferences from the evidence; (3) defendant failed to demonstrate how the verdicts were inconsistent and did not cite any caselaw in support of his argument; (4) defendant's claims that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for failure to file a proper motion to suppress, failure to argue involuntary intoxication and failure to call a doctor to testify regarding his mental condition were either barred by *res judicata* as it was raised in defendant's initial postconviction petition or otherwise meritless because defendant failed to establish prejudice; (5) defendant failed to show how the State's tardiness in turning over the felony review file prejudiced him; (6) defendant failed to demonstrate a substantial showing that trial counsel's cross-examination of Lemon was unreasonable where the record supported the inference that counsel was trying to mitigate what Lemon had already testified to and to call his credibility into question. The trial court reasoned that because all the issues raised concerning trial counsel's ineffectiveness were without merit, defendant did not suffer any prejudice from appellate counsel's decision not to raise them on appeal. Finding that appellate counsel was not ineffective, the trial court concluded that defendant failed to make a substantial showing of a constitutional violation and granted the State's motion to dismiss the petition. This appeal followed.

¶ 49                                    ANALYSIS

¶ 50    On appeal, defendant contends that this court should reverse the second stage dismissal of

his petition where he made a substantial showing that appellate counsel was ineffective for failing

to argue on direct appeal that his trial counsel was ineffective for eliciting damaging identification

evidence from codefendant Lemon. Defendant raises many of the same arguments from the

postconviction petition itself as well as those made before the trial court during the proceedings

on the petition.   Specifically, defendant claims that trial counsel's decision to cross-examine

Lemon regarding a prior statement to police that identified defendant as the shooter was extremely

damaging because it allowed the State to present additional statements from Lemon that

incriminated defendant, including the factual basis of Lemon's guilty plea.

¶ 51    As a preliminary matter, we note that defendant has concentrated his appellate argument

on this single claim, and thus has abandoned the remaining claims set forth in his postconviction

petition.  Accordingly, defendant had forfeited review of those claims. Ill. S. Ct. R. 341(h)(7) (eff.

May 25, 2018); *People v. Guest*, 166 Ill. 2d 381, 414 (1995).

¶ 52    The Act provides a means by which a defendant may challenge his conviction or sentence

for violations of federal or state constitutional rights.  *People v. Whitfield*, 217 Ill. 2d 177, 183

(2005).  To be entitled to postconviction relief, a defendant must show that he has suffered a

substantial deprivation of his federal or state constitutional rights in the proceedings that produced

the conviction or sentence being challenged. *Id.*

¶ 53    The Act also provides a three stage process for reviewing postconviction petitions. At the

first stage, the trial court may summarily dismiss a petition if it is frivolous or patently without

merit.  725 ILCS 5/122-2.1(a)(2) (West 2016).  At the second stage, counsel may be appointed for

defendant, if he is indigent. 725 ILCS 5/122-4 (West 2016). Counsel duties, pursuant to Rule 651(c), include consultation with the defendant to ascertain his contentions of deprivation of constitutional right, examination of the record of the trial proceedings, and amendment of the petition, if necessary, to ensure that defendant's contentions are adequately presented. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). Counsel is not required to raise frivolous claims on defendant's behalf. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). After counsel has made any necessary amendments to the petition, the State may move to dismiss it. 725 ILCS 5/122-5 (West 2016). If that motion is denied, or if no motion to dismiss is filed, the State must answer the petition, and the proceeding advances to the third stage, an evidentiary hearing where the defendant may present evidence in support of the petition. 725 ILCS 5/122-6 (West 2016).

¶ 54 During the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the trial court dismisses the petition at that stage, we generally review that decision *de novo*. *People v. Childress*, 191 Ill. 2d 168, 174 (2000). When a petition advances to the third stage, where fact-finding and credibility determinations are made, we will not reverse a trial court's decision unless manifestly erroneous. *Id*.

¶ 55 In this case, defendant's petition was dismissed on the State's motion at the second stage of proceedings. Thus, our review is *de novo*. *Id. De novo* review is completely independent of the trial court's decision and means that the reviewing court performs the same analysis that a trial judge would perform. *People v. Knowles*, 2019 IL App (3d) 180190, ¶ 40.

¶ 56     Claims of ineffective assistance of appellate counsel are measured against the same standard as claims of ineffective assistance of trial counsel, namely, the familiar two-prong *Strickland* test. *People v. Golden*, 229 Ill. 2d 277, 283 (2008).   A defendant must show that appellate counsel's performance fell below an objective standard of reasonableness and that the substandard performance caused prejudice, *i.e.*, there is a reasonable probability that but for appellate counsel's errors, the appeal would have been successful.  *Id.* Because both prongs of *Strickland* must be satisfied before a defendant can prevail, courts may resolve ineffectiveness claims by reaching only one component of the *Strickland* analysis.  *People v. Wiley*, 205 Ill. 2d 212, 230-31 (2001).

¶ 57     It is well-settled that appellate counsel is not required to brief every conceivable issue on appeal, and counsel is not ineffective for not raising issues, which, in his or her judgment, are without merit, unless his appraisal of the merits is patently wrong. *People v. Smith*, 195 Ill. 2d 179, 190 (2000). Appellate counsel's choices concerning which issues to pursue are entitled to substantial deference, and unless the underlying issue is meritorious, a defendant cannot show prejudice from the failure to raise the issue on appeal.  *Childress*, 191 Ill. 2d at 175; *People v. West*, 187 Ill. 2d 418, 435 (1999).

¶ 58     In this case, defendant argues that appellate counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness for the damaging cross-examination of Lemon on direct appeal. Generally, decisions on cross-examination and impeachment of witnesses are matters of trial strategy immune to claims of ineffective assistance of counsel.  *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997).  The way to cross-examine a particular witness involves the exercise of professional judgment, entitled to substantial deference from a reviewing court.  *Id*. at 326-27. A

defendant can only prevail on a claim of ineffective assistance of counsel by showing that counsel's approach to cross-examination was objectively unreasonable. *Id.* at 327.

¶ 59    Here, Lemon testified on direct, to the extent that he answered the State's questions, that he and four of the codefendants were present at a gang meeting at William's apartment but refused to say whether defendant was present. The State confronted Lemon with a portion of his handwritten statement in which he indicated that defendant was also present at the meeting. He refused to say whether a decision was made   the meeting to kill a Latin King and was subsequently held in contempt of court for failing to respond to the State's questions or to the court's inquiry. The record indicates that defense counsel then stated that he wanted to cross-examine Lemon and the State additionally stated that it wanted to question Lemon about the transcript from his guilty plea hearing.

¶ 60    On cross-examination, Lemon testified that he was told that if he signed the statement, he could go home, and that he was assaulted by police while he was at the station. Defense counsel questioned Lemon about who was present when the ASA made promises to him, and specifically questioned whether certain statements were made to police because Lemon thought the statements would allow him to go home. The "certain statements" were that defendant and "Cheese" were across the street together, "Cheese" nodded at defendant when they saw the decedent, and defendant then started shooting at the decedent.

¶ 61    On redirect examination, Lemon further stated that he was drunk and high when he gave the statement and that not all of it was true. However, the State impeached him with his oath at his guilty plea hearing that the written statement was true and accurate regarding his and his codefendants' involvement in the shooting.  Lemon then acknowledged some of his testimony at

his guilty plea hearing, but subsequently refused to answer or claimed not to remember the answer to questions surrounding whether the decision to shoot a Latin King was retaliatory, and whether defendant approached and shot the decedent three times.

¶ 62    Based on our review of the record, we conclude that defense counsel's questions had merit and were not irrational and unreasonable in light of the circumstances that defense counsel confronted at the time. See *People v. Faulkner*, 292 Ill. app. 3d 391, 394 (1997). It is clear that defense counsel was attempting to discount some of the evidence against defendant by discrediting Lemon's written statement and by questioning the circumstances surrounding the statement, *i.e.,* that Lemon was assaulted, and that the ASA made promises to him in exchange for the statement. Even on redirect, Lemon's testimony that he was drunk and high when the statement was given and that not all the claims contained in the statement were true were attempts to discredit the statement.

¶ 63    If defense counsel had not cross-examined Lemon, the jury would still have been left with Lemon's acknowledgment on direct that defendant was present at the meeting when gang business was discussed. His subsequent refusal to answer the State's questions opened the door for the introduction of his testimony from his guilty plea hearing into evidence. Therefore, contrary to defendant's assertions on appeal, it is not clear that defense counsel's cross-examination of Lemon made matters much worse for defendant. Additionally, although defendant's arguments on appeal do not acknowledge the other identification evidence against defendant at trial, specifically defendant's own confession and written statement, defense counsel's cross-examination of Lemon was not as damaging as argued on appeal.

¶ 64    It is clear that this is not a circumstance where defense counsel elicited evidence proving an element of the charge that the State otherwise could not prove (See *People v. Bailey*, 374 Ill. App. 3d 608, 615 (2007)), or introduced evidence in violation of defendant's right to confront witnesses (See *People v. Moore*, 356 Ill. App. 3d 117-123-27 (2005)). Defense counsel had reason to question Lemon to try and discredit his testimony as well as some of the other damaging evidence that the State had against defendant.  The fact that other evidence was also introduced as a result of the cross-examination, standing alone is insufficient to overcome the presumption of sound representation.

¶ 65    Moreover, even if counsel's performance was deficient, defendant cannot establish prejudice.  As noted previously, to establish prejudice, defendant must show that there is a reasonable probability that the result of the proceedings would have been different without defense counsel's errors.  *People v. Houston*, 229 Ill. 2d 1, 4 (2008).  Defendant can make no such showing here.

¶ 66    The State's evidence included defendant's confession that he shot the decedent in retaliation for an earlier incident that day where he was harassed by members of the Latin Kings gang. Defendant also gave a handwritten statement in the presence of an ASA, detectives, and a youth officer where he again stated that he shot the decedent in retaliation and further that it did not matter which one he shot because they were "all the same." Eyewitness Correa testified that he saw defendant during and after the shooting and was able to identify defendant in a lineup and in court. Correa also described the gun as a black gun with a brown handle, which was also how Kisha described the gun that Alvine gave to her to hide after the shooting. Additionally, based on other witness testimony about the group of teenagers running through the alley after the shooting,

defendant and codefendants were arrested in an apartment nearby very shortly after the shooting. Clearly, the evidence elicited by defense counsel was merely cumulative of the other evidence that the State presented at trial; it is not evidence that the jury would not have heard otherwise. We cannot say that but for defense counsel's cross-examination, there was a reasonable probability that the outcome of the trial would have been different. See *People v. Johnson*, 331 Ill. App. 3d 239, 247 (2002). Accordingly, we conclude that defendant has not established that he was prejudiced by defense counsel's cross-examination.

¶ 67    Based on our conclusion that defendant was not prejudiced by trial counsel's cross-examination of Lemon, it follows then that appellate counsel cannot be found ineffective for failing to raise this issue on direct appeal. *People v. Easley*, 192 Ill. 2d 307, 328 (2000). Thus, we find that defendant failed to make a substantial showing of appellate counsel's ineffectiveness in his postconviction petition, and the trial court properly dismissed it.

¶ 68                                    CONCLUSION

¶ 69    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 70    Affirmed.