2025 IL App (1st) 232297-U

FIFTH DIVISION
June 27, 2025

No. 1-23-2297

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 16284 |
| | ) | |
| IGNACIO CARRILLO, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*: The second-stage dismissal of defendant's postconviction petition is affirmed where (1) he failed to make a substantial showing that he received ineffective assistance of direct appellate counsel and (2) our *de novo* review alleviates any concern that the circuit court judge was biased against defendant or had prejudged his claim.

¶ 2    A jury found defendant Ignacio Carrillo (also spelled Carillo in previous proceedings) guilty of criminal sexual assault based on the use or threat of force (720 ILCS 5/12-13(a)(1) (West 2008)), and he was sentenced to ten years in prison. Mr. Carrillo petitioned for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), alleging that he had

received ineffective assistance of appellate counsel because his counsel failed to argue on direct appeal that the trial court abused its discretion by refusing to allow him to present an expert witness on the effects of date rape drugs. On appeal, Mr. Carrillo argues that he made a substantial showing of ineffective assistance of appellate counsel, and we should therefore reverse the dismissal of his petition and remand for third-stage proceedings. He further argues that comments made on the record demonstrate that the circuit court judge was biased against him, had prejudged his claim, and did not give his petition fair consideration. For the reasons that follow, we affirm the dismissal of Mr. Carrillo's petition.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Pretrial Proceedings

¶ 5     The State initially charged Mr. Carrillo with criminal sexual assault based on the use or threat of force (720 ILCS 5/12-13(a)(1) (West 2008)), criminal sexual assault based on knowledge of the victim's inability to consent (*id.* § 12-13-(a)(2)), and unlawful restraint (*id.* § 10-3(a)), charges stemming from his encounter with the complaining witness, R.W., on October 15, 2009.

¶ 6     The State was granted leave, over Mr. Carrillo's objection, to present at trial the testimony of X.L., another woman who claimed she had been sexually assaulted by Mr. Carrillo just under two years after he was alleged to have assaulted R.W. The State offered this testimony under section 115-7.3 of the Code of Criminal Procedure, which allows evidence of other crimes to be offered in sex crimes trials where its probative value outweighs the danger of unfair prejudice because of, among other things, the proximity in time to the charged offense and the degree of factual similarity between the offenses. 725 ILCS 5/115-7.3 (West 2012).

¶ 7     On August 2, 2013, defense counsel informed the State that Mr. Carrillo intended to call Dr. Gregory Teas as an expert witness to rebut anticipated testimony by both R.W. and X.L. that

Mr. Carrillo had given them incapacitating drugs without their knowledge. Dr. Teas, who was board-certified in psychiatry and treated individuals suffering from drug dependency and other addictive behaviors, acknowledged in his affidavit and expert report that he did not work in an emergency room, where individuals who had "acutely ingested" the so-called "date rape drugs" Rohypnol or GHB typically presented. He was familiar, however, with "an extensive literature" on the effects of those drugs and had helped treat individuals who abused substances within the same class of drugs. Although he was not a toxicologist, he was "familiar with the pharmacology of GHB and benzodiazepines (including Rohypnol)," including "their effects, their detection in toxicology screens and their side effects." In Dr. Teas's opinion, there was "no evidence of any sort that either of the complainants were drugged against their will," hospital personnel should have performed drug toxicology screens, and the ability of both women "to provide a somewhat detailed history of [their] recollection of events rather than claiming amnesia suggest[ed] they were not drugged."

¶ 8    The State moved to bar this testimony, on the grounds that Dr. Teas's qualifications as an addiction psychiatrist were not relevant to a case involving an individual's "one-time involuntary ingestion of date rape drugs." His general familiarity with the class of drugs did not provide him with any expertise that would assist the jurors in deciding Mr. Carrillo's guilt, the State maintained, and to the extent that he would testify that emergency room personnel did not perform the toxicology testing necessary to determine whether R.W. or X.L. had ingested date rape drugs, that fact was undisputed. "We don't need an expert to come in here and tell us that didn't happen," the assistant state's attorney (ASA) remarked.

¶ 9    Defense counsel argued in response that the State should not be permitted to present anecdotal evidence that drugs were given to these women—in support of its charge of sexual

assault based on Mr. Carrillo's purported knowledge that R.W. was unable to give consent—if Mr. Carrillo could not explain to the jurors what date rape drugs were, describe their effects on the mind and memory of a person who has ingested them, and question why these witnesses did not request toxicology screenings at the hospital.

¶ 10    The court granted the motion in part. The trial judge ruled that the "ultimate reason" the defense gave for calling Dr. Teas as a witness—to comment on the absence of a toxicology screening or other direct evidence that the women were drugged against their will—was not a basis on which to admit expert testimony because that was something that could easily be established on cross-examination. The court ruled, however, that Dr. Teas would be allowed "to explain Rohypnol, what a date rape drug does, common side effects, and other things like that."

¶ 11    After this ruling, and shortly before trial, the State dropped the charges of unlawful restraint and criminal sexual assault based on Mr. Carrillo's knowledge that R.W. was unable to give knowing consent, electing to proceed—now before a different trial judge—solely on the charge of criminal sexual assault based on the use or threat of force. The State again moved to bar Dr. Teas's testimony, and this time the court granted the motion in full and denied Mr. Carrillo's motion to reconsider. The court concluded that whether the victim was "woozy" because she was given a date rape drug, because she drank alcohol, or for some other unknown reason was no longer relevant.

¶ 12    The trial judge asked: "The question is whether he forced her or not, isn't that the issue?" The court also noted that, if R.W. or X.L. testified that they believed Mr. Carrillo had drugged them, then defense counsel could certainly explore the lack of evidence to support that belief, including the lack of a toxicology screening, and the jurors could decide whether to believe the witnesses or not. If, as defense counsel indicated, the women were expected to testified that Mr.

Carrillo joked with them about having put roofies in their drinks, then that was "what [Mr. Carrillo] said, not whether or not it was actually done." That merely drinking alcohol had "known effects on both social judgment as well as recall of data" was furthermore something that was "commonly understood" by a lay person. In sum, everything that defense counsel wanted the jury to know could be conveyed to them through cross-examination and argument; it was not, in the trial judge's view, the proper subject of expert testimony.

¶ 13                                B. The Trial

¶ 14    A three-day jury trial was held in December 2014. The State's theory of the case, as presented in its opening argument, was that while on a first date together, Mr. Carrillo gave R.W. alcoholic drinks and she began to feel disoriented. He walked her outside to the alley and tried to have sex with her, but she refused. He then took her in a cab to a second bar, where she had difficulty sitting on a bar stool and refused a third drink, and finally took her to a hotel. When R.W. realized where she was and tried to leave, Mr. Carrillo grabbed her by the hand, brought her back into the hotel and led her to a hotel room, where he sexually assaulted her. The State told the jurors, "[I]n Illinois when someone tells you no and you force them to have sex any way [*sic*], that is criminal sexual assault," and "that is exactly what happened inside that hotel room."

¶ 15    The defense's theory of the case was that R.W. had had unprotected, consensual, sex with Mr. Carrillo and later wished she had not. It was "[s]imply a case of regret." Defense counsel pointed out that R.W. did not wait for the police to arrive, either at the hotel or at the hospital she went to the next day for a sexual assault kit, and did not decide to press charges until two years later. Counsel argued the State would not be able to prove beyond a reasonable doubt that Mr. Carrillo "used force or threat of force on [R.W.] to engage in that sexual encounter."

¶ 16    Because one of Mr. Carrillo's arguments on appeal is that, although the charge based on

R. W.'s inability to give knowing consent had been dropped, at trial the State continued to pursue a theory of sexual assault based on Mr. Carrillo having drugged the two victims, we discuss the testimony of the various witnesses in some detail.

¶ 17                                    1. The State's Case

¶ 18                                    *R.W.*

¶ 19    R.W. testified that in 2009 she was 38 years old, living in Batavia, Illinois, with her sister, N.J., and working at the Field Museum in Chicago. She met Mr. Carrillo on a dating website called Plenty of Fish. After several calls and text messages, Mr. Carrillo invited her to attend an event at a bar called the Red Canary on the evening of October 15, 2009. R.W. agreed. She dropped her sister off at band practice and drove to the bar. Mr. Carrillo offered to get her a drink and, when she returned from the restroom, handed her a glass of red wine. He then began talking to two women at the bar while R.W. conversed with a friend of his. Mr. Carrillo later offered R.W. a shot of tequila, which she also drank. R.W. testified that by the time she was finished with the wine, she had "started feeling disoriented and very poorly," like she "couldn't keep up" and "was losing track of the conversation." She had had wine and shots of tequila in the past and had never felt that way before. R.W. excused herself and went to the restroom to try to collect her thoughts. She called N.J., whom she was supposed to pick up later that night, and told her she was not feeling well.

¶ 20    When R.W. came out of the restroom, Mr. Carrillo was waiting for her and appeared angry and frustrated. He accused her of flirting with the bathroom attendant and told her she should not have run off like that because he had "chosen" her. This surprised R.W., because he had hardly spoken to her since she arrived. Mr. Carrillo then took R.W. by the arm and led her to the loft area of the bar, which was quieter. Instead of stopping, however, he "walked right through" to another door that led downstairs to the alley. He then tried to have sex with her against a garbage can, but

she told him no. He said, "[F]ine, fine," and started texting on his phone. He grabbed her arm again and walked her down the alley to where his friend had her jacket and purse and had already hailed a cab. Mr. Carrillo "put" R.W. in the cab and the three of them were driven to another bar. It was approximately 9 p.m.

¶ 21    R.W. testified that she did not remember the cab ride. The next thing she knew, they were in a different bar, and she "was trying really hard to stay positioned on [the] stool that [she] was sitting on." Mr. Carrillo's friend offered her another drink, but she did not drink it. Mr. Carrillo then began to make fun of her, saying that she "was acting like he had put drugs in [her] drink, ruffies [*sic*] in [her] drink." He took her by the arm, saying, "Let's go," and the next thing she remembered, she was in a cab with him again. His friend was no longer there. When the car came to a stop at Clark Street and Diversey Parkway, R.W. recognized where she was and began texting her sister, telling her that she "was in trouble," and "needed her help." Mr. Carrillo took her by the arm and brought her into a hotel. He paid for a room, despite her protestations, and, when she tried to leave the hotel to flag a cab, he came out, took her by the arm again, and told her to "stop making a scene." He led her back into the hotel and to the hotel room.

¶ 22    According to R.W., Mr. Carrillo then took her phone, threw it across the room, and pushed her back onto the bed. She was too disoriented to immediately react. He stripped off her jeans, stripped off her underwear, lifted her legs, and started having sex with her. She repeatedly told him no and said, "[P]lease don't hurt me." The phone rang, and Mr. Carrillo answered it. It was the desk clerk, asking to speak to R.W. and for permission to come to the room, which she gave. There was a knock on the door, and the clerk was there with J.N., R. W.'s sister. R.W. testified that she was "nude from the waist down," and her sister began helping her collect her things, including her phone, which "had broke apart." R.W. said, "All I could think of was to get out of there as fast as

possible because I already tried to get away, and he had drawn me back."

¶ 23    As they were leaving, Mr. Carrillo rushed out of the room yelling. R.W. and J.N. ran, hailed a taxi, collected J.N.'s guitar from a restaurant where her fellow band members were keeping an eye on it for her, and went to find R.W.'s car. J.N. drove them to Delnor Community Hospital, where R.W. told the hospital staff what had happened and a sexual assault kit was collected from her. Later that morning R.W. also gave a statement over the telephone to a Chicago police detective. She did not immediately press charges, but when the police contacted her again in 2011, she agreed to do so.

¶ 24    On cross-examination, R.W. acknowledged that while in the restroom of the Red Canary, she received a call from a work colleague and, though she told him she felt terrible, did not ask him to call anybody for her. She further agreed that she did not tell either of the cab drivers that night that she wanted to be let out of the car. When R.W. left the hotel with her sister, she did not know that the police were on their way. She did not independently report her assault to the police because she believed the hospital would do that. R.W. insisted that she told the nurses in the emergency room, and perhaps a doctor, that she had been drugged. She thought they were taking her urine to test it for drugs but "found out later that's not how you test for drugs."

¶ 25                                      *J.N.*

¶ 26    R.W.'s sister, J.N., largely corroborated R.W.'s account. Sometime before 11:30 p.m., R.W. texted her to say she was not feeling well, that she was afraid, and that she wanted to leave. J.N. tried to call R.W. but kept getting disconnected. According to J.N., R.W. "was whispering" and "said she was afraid that he would be angry." At approximately 11:30 p.m., J.N. received another text from R.W., this time saying she was at a hotel near Clark Street and Diversey Parkway and "didn't want to be there." J.N. immediately hailed a cab and went to search for her sister at

two hotels in that area. When she described R.W. to the clerk at the second hotel, he knew who she was talking about and placed a call to the room.

¶ 27    R.W. answered the door naked from the waist down, "crying and visibly shaken." She looked scared, her hair was messy, and she seemed to J.N. to have poor balance and difficulty focusing. Mr. Carrillo was in the bed, undressed, and according to J.N., "very alert" and "kind of smirking." J.N. asked him if he had at least used a condom, and Mr. Carrillo said, sarcastically, "[W]e didn't do anything." J.N. helped her sister gather her belongings, and they left. Mr. Carrillo came out of the room, still putting his clothes on and "yelling and swearing at [them]." J.N. testified that she was frightened, explaining that he was "a very tall guy" and was "obviously upset" and "coming at [them] very aggressively." They left the hotel and eventually made their way to the hospital. J.N. said that R.W. was "not her normal self" and "not alert." Nor was she behaving as J.N. had seen her behave before when under the influence of alcohol.

¶ 28                                     *Lukasz Pawlik*

¶ 29    Lukasz Pawlik testified that he was working as a front desk clerk at the Inn at Lincoln Park, from 11 p.m. on October 15, 2009, until the following morning at 7 a.m. At around 11:30 or 11:45 p.m., Mr. Carrillo checked into the hotel at the front desk. There was a woman with him and, from the smell of alcohol on their breath, Mr. Pawlik believed they were both intoxicated. He checked them in, and they walked to their room. About an hour later, a woman arrived inquiring about her sister. He called the room for her and walked with her to the room, but stood to the side of the door, not seeing who answered the door. The second woman was inside the room for a period of time before exiting along with the first woman. Mr. Pawlik called 911, "[o]ut of concern that there was something suspicious going on," and two police officers arrived. They spoke to both Mr. Pawlik and Mr. Carrillo, and then they left.

¶ 30                                    *X.L.*

¶ 31    The State then presented its other crimes evidence. X.L. testified that she went on a date with Mr. Carrillo on September 2, 2011, after meeting him on Plenty of Fish. He picked her up at her home and drove her to "a bar off of Diversey," which she could not recall the name of. They had a conversation, during which she drank two beers, and then he ordered her a shot, which she also drank. When X.L. returned from the restroom, Mr. Carrillo had ordered her a martini. He left briefly, telling her that the bar they were at did not have olive juice, and he was going to one down the street to get some. He returned with some liquid in a disposable cup that he poured into the martini. He made a joke then, telling her to be sure to "stir it to get to the ruffie [*sic*] at the bottom." X.L. only took a sip, explaining that the drink was too salty and too strong for her taste. Mr. Carrillo was "disgusted" at this and urged her several more times to drink it. They went to a second bar, where X.L. ordered a bottle of water, and this also upset Mr. Carrillo.

¶ 32    They then walked to the parking garage where Mr. Carrillo had parked his car. X.L. testified that she was planning to go home at this point, but Mr. Carrillo "had mentioned that he had wanted to continue to do things." He stood in front of her when they reached the car and began touching her between her legs, under her dress. She told him to stop, saying, "[N]o, no, no," and pushing his hands down. Mr. Carrillo told her not to worry, that nothing was going to happen, but did not stop touching her. At some point he turned her around, so that she was bent over the car with his forearm on her back. He moved her underwear aside, pulled out the tampon she was wearing, and "[h]is penis was inside of [her] vagina." She started to cry and, at some point, "he finished and he opened the car door and told [her] to sit down."

¶ 33    X.L. explained that all of this happened very fast. She did not try to exit the vehicle because he "started the car right away." He wanted to take her to a hotel, but she told him to take her home.

X.L. explained that she felt strange on the ride home. The street lights were big and bright and "it was so fast." The 20-minute drive "felt like it was nothing." Mr. Carrillo dropped her off, first asking her for oral sex, which she refused, and then he "zoomed out of there," telling her it could have been a nice evening, but she had ruined it. Once home, X.L. took off her clothes and fell asleep on her couch wrapped in a sheet. The next day she went to the hospital, told them what had happened, and agreed to speak to the police. She did not ask for a toxicology test.

¶ 34                    *Motion to Reconsider Ruling on Expert Testimony*

¶ 35    At this point in the State's case, defense counsel again moved the court to reconsider its ruling barring Dr. Teas's testimony, arguing that the State had "almost gratuitously, brought forward evidence of ruffies [*sic*]" and "[c]learly they [had] opened the door." The State responded that "whether or not it happened [wa]s something for the jury to decide, not for an expert to opine about," and the court denied the motion.

¶ 36                                *Erin Slattery*

¶ 37    Nurse Erin Slattery testified that she was working the night shift in the emergency room at Delnor Hospital in Geneva, Illinois, on October 16, 2009. Shortly before 3 a.m., R.W. presented to triage with "a general complaint of sexual assault." According to Ms. Slattery, R.W. stated that "she was meeting with an individual that she had met online," that "they initially had gone to a bar with a group of friends, then later had broken off from that group and gone to a bar by themselves," and that "she remembered being in a hotel room where her clothes were being removed." She was able to text her sister before her phone "was shut off." She "remembered vaginal penetration occurring," and "had asked the individual to stop but he did not."

¶ 38    R.W. was examined, by both Ms. Slattery and a doctor. She had signs of "mild erythema," which Ms. Slattery described as "bruising and swelling," to her outer vaginal area and, internally,

abrasions to her cervix, findings that Ms. Slattery testified were consistent with R.W.'s account of what had happened but could also be consistent with consensual sex. A sexual assault kit was collected, and R.W. was given medication to help prevent pregnancy and antibiotics to prevent sexually transmitted disease. Ms. Slattery testified that R.W. did not appear to be under the influence of alcohol and did not report that she had been drugged. If she had, Ms. Slattery would have noted that in her report and the doctor would have ordered a toxicology screening.

¶ 39                                    *Stipulated Forensic Evidence*

¶ 40     The parties then stipulated to testimony concerning the collection and processing of the forensic evidence. In our prior decision on direct appeal in this matter, we incorrectly stated that there was "evidence of semen that matched Mr. Carrillo *and* also semen that matched another unknown male." (Emphasis added.) *People v. Carillo*, 2018 IL App (1st) 153000-U, ¶ 10. This was not accurate.. The DNA profile of the "unknown male" identified in the preliminary forensic report of vaginal swabs from R.W.'s sexual assault kit was later matched to the DNA profile of Mr. Carrillo.

¶ 41                                    2. The Defense's Case

¶ 42     The State rested, and defense counsel made an oral motion for a directed verdict that was denied.

¶ 43     The defense called Chicago police officer Angel Cintron. Officer Cintron did not recognize Mr. Carrillo and had no independent recollection of the events of October 15, 2009, but counsel established that he and his partner were patrolling the area of the Inn at Lincoln Park that evening, and Officer Cintron did not recall filling out any kind of report regarding an incident at the hotel. If he had filed such a report, he would have remembered it.

¶ 44                                   *Peter Gracey*

¶ 45    Counsel then called Peter Gracey, a longtime friend and former roommate of Mr. Carrillo's. Mr. Carrillo had invited Mr. Gracey to the Red Canary for cocktails on October 15, 2009, and Mr. Gracey was there when Mr. Carrillo's date arrived. He did not remember the date's name but described her as about 5 feet 5 inches tall, brunette, and around 40 years old. The date spent approximately two hours with them at the Red Canary, drinking alcoholic drinks and making casual conversation. Mr. Gracey was alone with Mr. Carrillo's date for periods of time, and at no point did she express fear or trepidation to him.

¶ 46    The three of them got into a cab and went to "the Ten Lizzy [*sic*]," a bar on the north side of the city. Mr. Gracey testified that Mr. Carrillo was not holding his date by the arm or any other part of her body. He did not force her into the cab, and she did not express any fear to him once in the cab. The three of them spent an hour to an hour-and-a-half at a second bar before parting ways, Mr. Gracey getting into one cab and Mr. Carrillo and his date getting into another. According to Mr. Gracey, there "was not a lot of drinking going on that night." They had "a couple rounds" at each bar, but "nothing too excessive."

¶ 47                               *Additional Stipulations*

¶ 48    The parties further stipulated that, if called to testify, Chicago police detective Midona (no first name given) would testify that she contacted R.W. on January 10, 2010, and R.W. told her she had decided "not to pursue this matter further." They then stipulated to the admissibility of cellular telephone records detailing text messages and calls between R.W. and Mr. Carrillo and between X.L. and Mr. Carrillo on the dates in question. Finally, the parties stipulated that Mr. Carrillo used his debit card on the dates in question to make various payments, including charges to the Red Canary and the Inn at Lincoln Park on October 15, 2009, and to the Ten Lizzy on

September 3, 2011.

¶ 49                                    3. Closing Arguments

¶ 50    The trial court admonished the jurors that what counsel would say in their closing arguments was not evidence and that the lawyers would indicate what they believed were reasonable inferences that should be drawn from the evidence, but that it was up to the jurors to decide what the evidence was and whether it applied or did not apply. The lawyers would also say what they believed the law to be, but it was the court that would tell the jurors what law to apply once arguments had concluded.

¶ 51    The State argued that the case was "not about romance regretted" but "about force," about "domination, humiliation, [and] intimidation." The ASA read out both the jury instruction on sexual assault by force or threat of force and the definition of force. He asked the jurors to believe R.W.'s testimony "about being thrown on that bed, being forced on that bed" and reminded them that when R.W. tried to leave, Mr. Carrillo "came after her, took her by the arm, and brought her back into that hotel." "That is force," the ASA argued, "That is physical restraint." The ASA also pointed out that R.W. "was five seven, about 135 pounds," and that Mr. Carrillo was "[p]robably six inches taller" and "[m]aybe 60 pounds heavier than her." The State reminded the jurors that R.W.'s sister had seen R.W. under the influence of alcohol before, and that "wasn't what was going on." The ASA said that this "corroborat[ed] the force and threat of force that [R.W.] told [them]."

¶ 52    Defense counsel used the timing of various text messages and credit card transactions to try to undermine R.W.'s testimony, arguing that it was more likely that R.W., Mr. Carrillo, and Mr. Carrillo's friend left the Red Canary at around 10:30 p.m. on September 15, 2009, than around 9 p.m., as R.W. had testified. Counsel questioned whether R.W. would not have had more than

one glass of wine and one shot of tequila in the three to three-and-a-half hours she spent with the two men at two different bars. Counsel also questioned why R.W. did not just end the date if she was not having a good time and why she did not say anything to the cab drivers or other people at the bar if she felt afraid or uncomfortable. Counsel questioned whether Mr. Carrillo, if he had been "out to rape [R.W.]" would really have stopped to order a pizza first, as his debit card transactions indicated he did. And counsel questioned R.W.'s testimony that she told the nurses at the hospital that she had been drugged, saying that if she had, "can you imagine the hospital in this day and age not testing?" Counsel asked the jurors to conclude that R.W. had simply had too much to drink, acted recklessly, and had unprotected sex with a man she didn't really like, then later concocted a story of sexual assault because she had regrets.

¶ 53   In rebuttal, the State argued:

"Whatever [R.W.] drank at the Red Canary, whatever was in her drink at the Red Canary, caused her to feel so confused and so out of control she didn't know what was going on, and he seized that opportunity. She was not in control. He was in control.

* * *

She told you there were times that she did not know what was going on. But you know who knew? This guy. He was in control from the moment that she came out of that bathroom at the Red Canary. He took her hand and led her upstairs to the lounge. He took her hand and took her downstairs out into the alley, up against that garbage can where he wanted to have sex with her. He put her in a cab. He brought her to a second bar. He put her in another cab. He brought her to that hotel.

And when she tried to leave that hotel and hail a cab to get out of there, he grabbed her arm, hauled her back into that hotel. He took her to that room. He took her pants off.

He pushed her down on the bed. And he forced her to have sex with him.

Because of the way that she was feeling from those drinks at that bar, she could not get away from him. But she said, no. And under the law, that is more than satisfactorily [*sic*]. She told him she did not want to have sex. No. Please don't hurt me. That is not consent."

¶ 54    The ASA then asked the jurors to consider X.L.'s testimony and whether it sounded familiar to them. "Their first date was at a bar. He's providing the drinks," counsel said, reminding them how Mr. Carrillo encouraged X.L. to drink the martini he had ordered for her, even though she didn't like it. Finally, counsel asked the jurors to consider the demeanor of both women on the stand—to recall that they were crying and visibly upset—and to believe their testimony.

¶ 55                    C. Verdict, Sentencing, and Direct Appeal

¶ 56    The jury found Mr. Carrillo guilty on the single count of aggravated criminal sexual assault based on the use or threat of force. In his motion for a new trial, Mr. Carrillo argued, among other things, that it had been wrong for the court to completely bar the testimony of Dr. Teas. "Although the State did not bring a charge based upon the alleged victim not being able to give consent," he argued, the testimony presented "would lead a trier of fact to the reasonable inference that the witnesses were drugged." Dr. Teas's testimony, which would have pointed out inconsistencies between the witnesses' allegations and the actual effects of date rape drugs, "was relevant to counteract that inference." The State had exploited that imbalance, Mr. Carrillo insisted, by suggesting in its closing argument that Mr. Carrillo was better able to "control" R.W. because of her impaired state.

¶ 57    The court denied the motion. The judge explained that the only issue presented to the jurors was force, "[a]nd the jurors were convinced beyond a reasonable doubt that the act of penetration

- 16 -

upon [R.W.] was accomplished in that fashion, by force or threat of force." They were not asked to decide whether the act was accomplished due to R.W.'s inability to consent.

¶ 58    A sentencing hearing was held on September 11, 2015. In aggravation, the court considered R.W.'s victim impact statement as well as the testimony of a third woman, A.A., who recounted her own experience with Mr. Carrillo in 2014, while he was out on bond in this matter. Mr. Carrillo, in addition to presenting a voluminous packet of written materials detailing his education, work history, and contributions to society, gave a statement in allocution in which he said he was "embarrassed and ashamed of [his] behavior" and hoped R.W. could somehow forgive him. The court sentenced Mr. Carrillo to 10 years in prison (to be served at 85%), followed by a period of mandatory supervised release.

¶ 59    On direct appeal, Mr. Carrillo challenged only his 10-year sentence. We rejected his arguments and affirmed his conviction. *Carillo*, 2018 IL App (1st) 153000-U, ¶ 30.

¶ 60                              D. Postconviction Proceedings

¶ 61    On August 15, 2019, Mr. Carrillo filed a *pro se* petition for postconviction relief raising a number of purported constitutional violations, including, relevant here, that his sixth amendment right to effective counsel was violated when his direct appellate counsel failed to raise the trial court's ruling barring Dr. Teas from testifying as a ground for reversal. Mr. Carrillo asserted that the first judge's ruling—that Dr. Teas could explain to the jury the mechanism and effects of date rape drugs—was correct, and that it was error for the second judge, who ultimately oversaw the trial, to overrule that decision and bar Dr. Teas from taking the stand. Mr. Carrillo was prejudiced by this error, he contended, because even though the State dropped the charge of sexual assault based on an inability to consent, it exploited the ruling by eliciting and commenting on the witnesses' testimony suggesting that Mr. Carrillo had in fact drugged them. Although the issue

- 17 -

was fully preserved, Mr. Carrillo's appellate counsel failed to raise it, among other arguments he claimed they should have made on direct appeal. Had they raised those matters, he insisted, "it [was] likely that several of the issues listed in [his] petition *** would have earned [him] a new trial."

¶ 62    The circuit court summarily dismissed the petition as frivolous and patently without merit on November 14, 2019, concluding that none of the issues raised in Mr. Carrillo's "laundry list of claims" had any potential merit.

¶ 63    Mr. Carrillo appealed. Pursuant to an agreed order entered on March 3, 2020, we vacated the circuit court's dismissal order, on the basis that the court had failed to rule on Mr. Carrillo's postconviction petition within 90 days, as required by section 122-2.1(a) of the Act (725 ILCS 5/122-2.1(a)(2) (West 2022)), and remanded for second-stage proceedings and the appointment of postconviction counsel. *People v. Carrillo*, No. 1-20-0215 (Mar. 3, 2021).

¶ 64    At a February 17, 2023, status hearing held on remand, the trial judge recalled that the case was about "[s]exual assault in a bar or something" and that Mr. Carrillo had given the victim "that date rape drug." The judge expressed impatience with defense counsel's request for time to locate a witness, noting that Mr. Carrillo's petition "was frivolous when [the court] dismissed it to begin with, except [the court] waited one day too long." The judge told the parties, "We're not waiting much longer for a so-called witness." The judge was similarly displeased when, on May 17, 2023, the State requested additional time for a new ASA to be assigned to the matter, saying: "You don't need a four month date for this one" and "I don't care about what [the State's Attorney] thinks about this at all *** I already ruled this is frivolous without merit."

¶ 65    The State moved to dismiss the petition on June 20, 2023. It argued that appellate counsel was not required to brief every conceivable argument on appeal and it was not deficient

performance to refrain from raising an issue that, in counsel's judgment, lacked merit. Here, the testimony Dr. Teas would have offered either concerned the intoxicating effects of alcohol, a matter within the realm of a juror's common knowledge, or would simply have bolstered the defense's argument that there was no medical evidence confirming the use of a date rape drug, a fact that was undisputed and irrelevant, given the State's decision not to pursue a charge of sexual assault based on Mr. Carrillo's knowledge that R.W. was incapable of consenting.

¶ 66    At the hearing on the motion, held on October 3, 2023, the judge began by noting for the record that he had received a letter from Mr. Carrillo asking to send a message of apology to R.W. and X.L. as part of a program he wanted to participate in from prison. The judge found this to be completely inappropriate, saying "I do not work for you, sir." He reminded Mr. Carrillo, "Those are your victims, sir," and told him, "I do not find ways for rapists to contact their victims to apologize or otherwise." The judge acknowledged that he was "a little annoyed" going so far as to note that, if he could add time to Mr. Carrillo's sentence "for [his] ridiculous request," then he would.

¶ 67    The judge then heard argument on and granted the State's motion to dismiss Mr. Carrillo's postconviction petition. The judge explained that Dr. Teas's proffered expert testimony was not relevant and, in the court's view, no argument could be made that direct appellate counsel was ineffective for failing to raise the court's decision to bar that testimony as a ground for reversal. "[T]he trial was based on the fact that he forced a girl to have sex," the court explained, "not that she was given a date rape drug and had sex for that reason."

¶ 68                              II. JURISDICTION

¶ 69    The circuit court dismissed Mr. Carrillo's postconviction petition on October 3, 2023, and he timely filed a notice of appeal on November 2, 2023. We have jurisdiction pursuant to article

- 19 -

VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 (eff. Sep. 18, 2023) and 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 70                                    III. ANALYSIS

¶ 71    Mr. Carrillo appeals from the second-stage dismissal of his postconviction petition. The Act provides a method for an imprisoned individual to collaterally attack his or her conviction by establishing that "in the proceedings which resulted in [the] conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2022). The circuit court must first independently determine, within 90 days of its filing, whether a postconviction petition should be summarily dismissed because it is frivolous or patently without merit. *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010) (citing 725 ILCS 5/122-2.1(a)(2) (West 2006)). A summary dismissal order entered more than 90 days after the petition is filed—as was the case here—is void. *Id.* at 114 (collecting cases). The petition automatically advances to the second stage of proceedings, counsel is appointed to represent the defendant, and the State must either move to dismiss or answer the petition. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996); 725 ILCS 5/122-4, 122-5 (West 2022).

¶ 72    The court engages in no fact-finding or credibility determinations at the second stage but takes as true all allegations not affirmatively rebutted by the record. *People v. Dupree*, 2018 IL 122307, ¶ 29. It is concerned only with "the legal sufficiency of the petition's well-pled allegations of a constitutional violation"—*i.e.*, whether the allegations "if proven at an evidentiary hearing, would entitle [the] petitioner to relief." (Internal quotation marks omitted.) *Id.* To advance to the third and final stage, an evidentiary hearing on the merits, the court must determine that the petition makes a substantial showing of a constitutional violation. *People v. Tate*, 2012 IL 112214, ¶ 10;

725 ILCS 5/122-6 (West 2022). Our review of the dismissal of a postconviction petition at the second stage is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 73     A. Mr. Carrillo's Claim of Ineffective Assistance of Direct Appellate Counsel

¶ 74     Mr. Carrillo argues that he made a substantial showing of a violation of his sixth amendment right to counsel based on the failure of his appellate counsel to argue on direct appeal that the trial court's refusal to allow him to present an expert witness on the effects of date rape drugs was an abuse of discretion necessitating the reversal of his conviction. To prevail on a claim of ineffective assistance of appellate counsel, a defendant must satisfy the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984), by showing both: (1) that "appellate counsel's performance was deficient" and (2) "but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. English*, 2013 IL 112890, ¶ 33.

¶ 75     Where, as here, the opposing argument is that the issue counsel did not raise on appeal was unlikely to succeed, the two prongs of the *Strickland* test tend to merge. As our supreme court explained in *People v. Simms*, 192 Ill. 2d 348, 362 (2000), "[a]ppellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." Nor, of course, is a defendant prejudiced by the failure to raise a meritless argument. *People v. Edwards*, 195 Ill. 2d 142, 164 (2001).

¶ 76     We turn then to the merits of the argument Mr. Carrillo maintains his direct appellate counsel should have made—that it was reversible error for the trial court to bar the testimony of Dr. Teas. "A criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf." *People v. Lerma*, 2016 IL 118496, ¶ 23.

Whether to admit or exclude any evidence, however, including expert opinions, is a decision within the sound discretion of the trial court, and we will not reverse for a failure to admit testimony absent an abuse of the court's discretion. *People v. King*, 2020 IL 123926, ¶ 35. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* Notably, reasonable minds can differ regarding whether evidence is admissible without requiring reversal under this standard. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 77 "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). Before admitting expert testimony for a jury's consideration, the trial court should "balance its probative value against its prejudicial effect" and "consider the necessity and relevance of the expert testimony in light of the particular facts of the case." *Id.* at 290. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 78 We agree with the State that the trial court's decision to exclude Dr. Teas's testimony was not an abuse of discretion. Mr. Carrillo notes that his trial counsel took pains to preserve this issue for appeal, objecting to the State's motion *in limine*, asking the court to reconsider its decision to grant that motion, and raising the purported error in his motion for a new trial. Just because an issue was preserved for appeal does not mean it was likely to succeed on appeal, however. Although the doctor's testimony regarding the effects of certain incapacitating drugs would likely have exceeded the everyday knowledge of the average juror, we are not persuaded that that

testimony would have assisted the jurors in deciding any relevant issue in this case.

¶ 79    Mr. Carrillo argues that Dr. Teas's testimony was necessary to show that the symptoms described by both R.W. and X.L. were more consistent with the ingestion of alcohol than with the effects of incapacitating drugs. That might have been a relevant distinction when the State was still trying to prove that Mr. Carrillo knew R.W. was incapable of consenting to sexual penetration. By the time this case went to trial, however, the State had abandoned that charge, proceeding only on the theory that sexual assault was achieved through force or the threat of force. As to *that* charge, the reason R.W. and X.L. may have felt disoriented—or whether Mr. Carrillo had drugged them to ensure that they were incapable of consenting—did not matter at all. The women's testimony, which the jurors were entitled to believe, was that Mr. Carrillo had sex with them by force. That the women felt disoriented may have explained their behavior or led the jurors to conclude that less force was needed to overcome them. But the *reason* the women felt disoriented—because they drank alcohol or were drugged or something else entirely—was simply not a question the jury needed to decide.

¶ 80    We are required to presume that a jury followed the instructions that were given to it. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). The jurors here were instructed that the charge against Mr. Carrillo was sexual assault by force or the threat of force. They were told that for them to find Mr. Carrillo guilty of criminal sexual assault, the State had to prove beyond a reasonable doubt that (1) Mr. Carrillo "committed an act of sexual penetration upon [R.W.]," (2) "the act was committed by the use of force or threat of force"— defined as "the use of force or violence or the threat of force or violence when the accused has overcome the victim by use of superior strength, superior size, physical restraint or physical confinement"—and (3) "[R.W.] did not consent to the act of sexual penetration," meaning she did not "freely giv[e] [her] agreement" to it. That is the

only charge that was put to the jury and the only charge that it was necessary for them to consider.

¶ 81    Mr. Carrillo contends that, notwithstanding the State's decision to drop the charge that R.W. was incapable of consent, the "evidence presented at trial and the arguments raised by the State clearly show that the use of incapacitating drugs was a substantial part of the State's case against [him]." However, as noted above, the jury is presumed to have followed the court's instructions as to what the State needed to prove for it to find that Mr. Carrillo was guilty. Given the elements of the charge on which Mr. Carrillo was tried, it was certainly not an abuse of discretion to bar this testimony, which was only directly relevant to a charge that the State had dismissed.

¶ 82    Mr. Carrillo also insists that, if Dr. Teas's testimony was not relevant, then "it was error for the court to have allowed the admission of any evidence regarding incapacitating drugs," an error he argues was compounded by statements made by the State in its opening and closing arguments. This argument is simply not any part of this appeal. There is no claim in this postconviction petition concerning the improper admission of testimony regarding incapacitating drugs or the ineffective assistance of trial counsel for failing to object to such evidence. Indeed, instead of objecting to such evidence, trial counsel  appears to have made a strategic decision to undermine it and the women's credibility by establishing on cross-examination that the women had been drinking alcohol, that neither of them was tested for incapacitating drugs, that X.L. never requested such a test, and that if R.W. did, as she claimed, the hospital would likely have performed one. This strategic decision by trial counsel would not have been a basis for any meritorious claim of ineffective assistance and, indeed, none was made on this basis.

¶ 83    In sum, the trial court's decision to exclude Dr. Teas's testimony was not an abuse of

discretion, and appellate counsel's decision not to raise that issue on direct appeal was therefore neither objectively unreasonable nor prejudicial. Accordingly, the circuit court was correct to dismiss this petition for failure to make a substantial constitutional claim.

¶ 84                    B. Comments Made by the Circuit Court on Remand

¶ 85    Mr. Carrillo additionally argues that comments the circuit court judge made on remand demonstrate that he was biased against Mr. Carrillo and had prejudged the merits of his petition. Where, as here, a postconviction petition automatically advances to the second stage, because the circuit court's summary dismissal order was not entered within 90 days, it will of course be the case that the judge has already concluded that the petition lacks merit. That is unavoidable. Mr. Carrillo argues, however, that the judge's comments here on remand went too far—that the judge was clearly frustrated with having to conduct second-stage proceedings, which he viewed as a waste of time, and ruled on the State's motion to dismiss Mr. Carrillo's petition only after angrily admonishing Mr. Carrillo regarding what the court viewed as his misguided efforts to make contact with the complaining witnesses. The State argues that Mr. Carrillo cannot show substantial prejudice because the judge's comments did not rise to the level of " 'animosity, hostility, ill will, or distrust towards' " him. (quoting *People v. Patterson*, 192 Ill. 2d 93, 131 (2000).

¶ 86    We need not decide in this case whether the court's harsh remarks compel a finding of bias. Our review of the dismissal of a postconviction petition at the second stage is *de novo*. *Tate*, 2012 IL 112214, ¶ 10). This means that we, as the reviewing court, perform the same analysis that the trial judge would perform. *People v. Knowles*, 2019 IL App (3d) 180190, ¶ 40. Our independent determination that Mr. Carrillo has failed to make the substantial showing of a constitutional violation necessary to advance to third-stage proceedings means that no prejudice can have resulted from the circuit court judge's hostility towards Mr. Carrillo or his prior consideration of

Mr. Carrillo's petition.

¶ 87                                    IV. CONCLUSION

¶ 88    For the above reasons, we affirm the second-stage dismissal of Mr. Carrillo's postconviction petition.

¶ 89    Affirmed.